PREISER, COMMISSIONER OF CORRECTIONAL
SERVICES OF NEW YORK, ET AL. *v.* NEWKIRK

No. 74–107.   Argued January 20, 1975—Decided June 25, 1975

*Hillel Hoffman,* Assistant Attorney General of New
York, argued the cause for petitioners.   With him on the

brief were *Louis J. Lefkowitz,* Attorney General, *Samuel A. Hirshowitz,* First Assistant Attorney General, and *Joel Lewittes,* Assistant Attorney General.

*Daniel Pochoda* argued the cause for respondent. With him on the brief were *William E. Hellerstein* and *Marjorie Mazen Smith.**

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

Respondent Newkirk has been an inmate of the New York prison system since his conviction for murder in the second degree in 1962. He had initially been confined at the Ossining Correctional Facility and, subsequently, at the Attica Correctional Facility, the Green Haven Correctional Facility, and the Auburn Correctional Facility. These facilities were maximum security institutions[1] at the time respondent was confined in them and are located in different parts of New York. In April 1971, nine years after his initial confinement, he was transferred to the Wallkill Correctional Facility, a medium security institution. The District Court and

---

*Solicitor General Bork, Acting Assistant Attorney General Keeney, Deputy Solicitor General Frey,* and *Joseph S. Davies* filed a brief for the United States as *amicus curiae* urging reversal

*Barbara M. Milstein, Alvin J. Bronstein, Arpiar G. Saunders, Jr., Jack Greenberg, Stanley A. Bass,* and *Cary Coen* filed a brief for the National Prison Project et al. as *amici curiae* urging affirmance.

[1] New York State has six correctional facilities that are designated as maximum security institutions: Attica, Auburn, Clinton, Green Haven, Ossining, and Great Meadow. Eight facilities, or portions thereof, are designated as medium security institutions: Adirondack, Bedford Hills, Coxsackie, Elmira, Eastern, Fishkill, Tappon, and Wallkill. Six others are designated minimum security institutions: Albion, Bayview, Edgecombe, Parkside, Rochester, and Taconic. There are also four minimum security correctional camps. See 7 NYCRR, pt. 100, §§ 100.1–100.94.

the Court of Appeals found, and it is not seriously disputed here, that the Wallkill facility is "unique," and has advantages over other correctional institutions in the New York system in that there are fewer restrictions and physical restraints as well as a more comprehensive rehabilitation program.

Early in 1972, a petition aimed at the formation of a prisoners' "union" was circulated at Wallkill. This event produced some vociferous controversy among the prisoners. Tension among the inmates, according to the District Court, stemmed in part from the hostility of an existing prisoner representative committee toward the "union" movement. The prison administration, however, did not forbid or actively discourage the circulation of the petition. The administrators did, however, monitor the level of unrest within the prison brought on by the clash of opinions on the petition. On June 2, 1972, there was a general meeting of the inmates at which the petition was discussed loudly by the contending factions; the meeting dispersed peacefully, however, without incidents of violence. Respondent did not attend this meeting, but he had previously signed a proposed "union" constitution and, immediately prior to the meeting, had received a petition from a fellow inmate, signed it, and passed it along.

A report prepared by the assistant deputy superintendent identified Newkirk as one of the inmates who had been canvassing for the "union" but did not charge him with any violation of regulations or misconduct. This report—including its naming of Newkirk—was apparently based on information other officers had given the assistant deputy superintendent. Newkirk was not afforded an opportunity to give his account. The following day, on June 6, 1972, the superintendent called the central office of the Department of Corrections and

arranged for transfer of several inmates, including New-kirk, to other facilities within the state corrections system. The transfer of Newkirk was effected on June 8. He was summoned to the infirmary and informed that he was being transferred.

Newkirk was transferred to the Clinton Correctional Facility, a maximum security institution. The conditions for the general prison population at Clinton were substantially different from those at Wallkill. At Clinton, the cells are locked, access to the library and recreational facilities is more limited, and the rehabilitation programs are less extensive. Newkirk requested a truck-driving assignment when he arrived at Clinton and understood he was on a waiting list. He was then assigned to the residence of the superintendent of Clinton at the same wage he earned at Wallkill. Since Newkirk's family lived in New York City, 80 miles from Wallkill but 300 miles from Clinton, his transfer to Clinton made visits by his family more difficult.

Newkirk and three of the other four prisoners transferred from Wallkill brought suit in the United States District Court for the Southern District of New York, pursuant to 28 U. S. C. §§ 1343 (3) and (4), and 42 U. S. C. § 1983, against the superintendent of Wallkill and the State Commissioner of Correctional Services. They requested a declaratory judgment that the transfers were in violation of the Constitution and laws of the United States and an injunction ordering their return to Wallkill, expunging all record of their transfer, and prohibiting future transfers without a hearing. The District Court denied a preliminary injunction but set the case for trial on an accelerated basis. Prior to the commencement of the trial, two of the plaintiffs were released and the complaint was dismissed inso-

far as it related to them. During the trial another plaintiff was released, and the action was dismissed as to him as well; subsequently Newkirk was returned to Wallkill. The superintendent of that institution also had a memorandum placed in respondent's file which explained the nature of the transfer, noted that the transfer was not for disciplinary reasons, and was not to have any bearing on eligibility for parole or the decisions of the time-allowance committee.

The District Court held that the transfer violated the Due Process Clause of the Fourteenth Amendment since it had been made without any explanation to Newkirk or opportunity to be heard. The court entered a declaratory judgment which required that Newkirk be given such an explanation and an opportunity to be heard in connection with any future transfer, and further declared that no adverse parole action could be taken against Newkirk or punishment administered because of the transfer. It held that Newkirk should be informed of the scope of permissible behavior at Wallkill and the circumstances which would warrant his transfer to another prison in the future. At the same time, however, the court refused the prayer for an injunction against future summary transfers because it was "not persuaded that the threat of transfer is sufficiently great at this time . . ." *Newkirk* v. *Butler,* 364 F. Supp. 497, 504 (1973); the court concluded that "in the present posture of the case there is not a sufficiently delineated controversy to merit its adjudication," *id.,* at 500. Noting that "an explanatory note has been included with the record of transfer, and that no action adverse to plaintiff, whether with reference to parole or discipline, will be based on this information . . . ," *id.,* at 504, the court also denied a request that all record of the transfer be expunged from his file.

The Court of Appeals affirmed the judgment with some modification. 499 F. 2d 1214 (CA2 1974). It held that, when a prisoner suffers a "substantial loss" as a result of the transfer, "he is entitled to the basic elements of rudimentary due process, i. e., notice and an opportunity to be heard," *id.*, at 1217, whether or not his transfer is part of a formal disciplinary proceeding and whether or not it has any adverse parole consequences. Noting that there were no formal disciplinary proceedings in this case, the Court of Appeals relied on the fact that the transfer changed Newkirk's living conditions, his job assignment, and training opportunities. However, although agreeing that advance publication of "rules," violation of which might result in transfer, "would serve the salutary function of avoiding misunderstanding and resentment . . . ," *id.*, at 1219, the Court of Appeals concluded that requiring prison officials to draw up such rules would place officials in "an unnecessary straight jacket [*sic*]." *Ibid.* It, therefore, modified the judgment of the District Court to remove this requirement from its order. Although specifically noting that Newkirk had been returned to Wallkill from Clinton, the Court of Appeals held that the suit was not moot since "[e]ven after his return he remained subject to a new transfer at any time . . . ." *Ibid.* Furthermore, despite the District Court's reliance on the good-faith assurances of prison officials that the transfer would not have an adverse effect on Newkirk's parole possibility, the Court of Appeals concluded he was "entitled to a judicial decree to that effect." *Ibid.*

We granted petitioners' petition for writ of certiorari which presented the following question: "Whether a prison inmate who is transferred within a state from a medium security institution to a maximum security insti-

tution, without the imposition of disciplinary punishment, is entitled under the Due Process Clause of the Fourteenth Amendment to notice of the reasons for the transfer and an opportunity to be heard"? [2]   In granting the petition, however, the Court directed that the parties brief and argue the question of mootness.   419 U. S. 894 (1974).

All of the developments since the original challenged transfer must be read in light of not only Newkirk's transfer to Wallkill but also his later transfer, after the decision of the Court of Appeals, to the Edgecombe Correctional Facility, a minimum security institution in New York City.   Newkirk will be eligible for parole in July 1975.[3]

The exercise of judicial power under Art. III of the Constitution depends on the existence of a case or controversy.   As the Court noted in *North Carolina* v. *Rice*, 404 U. S. 244, 246 (1971), a federal court has neither the power to render advisory opinions nor "to decide questions that cannot affect the rights of litigants in the case before them."   Its judgments must resolve " 'a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.' "   *Ibid.*, quoting *Aetna Life Ins. Co.* v. *Haworth,* 300 U. S. 227, 241 (1937).   As the Court noted last Term, in an opinion by Mr. Justice Brennan, *Steffel* v. *Thompson,* 415 U. S. 452, 459 n. 10 (1974): "The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed. See, *e. g., Roe* v. *Wade,* 410 U. S. [113,] 125 [(1973)];

---

[2] Pet. for Cert. 2.   See this Court's Rule 23 (1)(c).

[3] Tr. of Oral Arg. 7, 22; Brief for Respondent 10.

*SEC* v. *Medical Comm. for Human Rights,* 404 U. S. 403 (1972); *United States* v. *Munsingwear, Inc.,* 340 U. S. 36 (1950)."

In *Maryland Casualty Co.* v. *Pacific Co.,* 312 U. S. 270 (1941), this Court, noting the difficulty in fashioning a precise test of universal application for determining whether a' request for declaratory relief had become moot, held that, basically, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, *of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Id.,* at 273 (emphasis supplied). This is not a class action and Newkirk has not sought damages. As noted, *supra,* before the ruling of the District Court, Newkirk had been transferred back to Wallkill and had been there for 10 months. No adverse action was taken against him during that period. A notation had been made in his file expressly stating that the transfer "should have no bearing in any future determinations' made by the Board of Parole or the time allowance committee." Newkirk has now been transferred, as noted above, to a minimum security facility in New York City. It is therefore clear that correction authorities harbor no animosity toward Newkirk. We have before us more than a "[m]ere voluntary cessation of allegedly illegal conduct," *United States* v. *Concentrated Phosphate Export Assn., Inc.,* 393 U. S. 199, 203 (1968), where we would leave "[t]he defendant . . . free to return to his old ways." *United States* v. *W. T. Grant Co.,* 345 U. S. 629, 632 (1953). As to Newkirk's original complaint, there is now " 'no reasonable expectation that the wrong will be repeated,' " *id.,* at 633, quoting *United States* v. *Aluminum Co. of America,* 148 F. 2d 416, 448 (CA2 1945).

Any subjective fear Newkirk might entertain of being again transferred, under circumstances similar to those alleged in the complaint, or of suffering adverse consequences as a result of the 1972 transfer, is indeed remote and speculative and hardly casts that "continuing and brooding presence" over him that concerned the Court in *Super Tire Engineering Co.* v. *McCorkle,* 416 U. S. 115, 122 (1974). As the Court noted in *United States* v. *SCRAP,* 412 U. S. 669, 688–689 (1973), "pleadings must be something more than an ingenious academic exercise in the conceivable. A plaintiff must allege that he has been or will in fact be perceptibly harmed by the challenged agency action, not that he can imagine circumstances in which he could be affected by the agency's action." Similarly, while there is always the *possibility* that New York authorities might disregard the specific record notation that the transfer should have no effect on good time or parole decisions in regard to Newkirk, "such speculative contingencies afford no basis for our passing on the substantive issues [Newkirk] would have us decide . . . ," *Hall* v. *Beals,* 396 U. S. 45, 49 (1969). The record of events since the challenged transfer hardly bears out a genuine claim of an injury or possible injury "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co.,* 312 U. S., at 273. Newkirk, as noted above, will be eligible for parole within a matter of days. See *supra,* at 401.

We conclude that the question presented does not fall within that category of harm "capable of repetition, yet evading review," *Southern Pacific Terminal Co.* v. *ICC,* 219 U. S. 498, 515 (1911); *Roe* v. *Wade,* 410 U. S. 113, 125 (1973). Accordingly, we vacate the judgment of the Court of Appeals and remand the case to that court

with directions that the complaint be dismissed by the District Court. *United States* v. *Munsingwear, Inc.*, 340 U. S. 36, 39 (1950).

*It is so ordered.*

MR. JUSTICE DOUGLAS dissents from the holding of mootness and would affirm the judgment below.

MR. JUSTICE MARSHALL, concurring.

I join this opinion only because for some reason respondent did not file this case as a class action. As a result, the State of New York by releasing the other three named plaintiffs, transferring respondent back to Wallkill after the District Court action, and finally to a lesser correctional facility after the Court of Appeals acted, thereby made the case moot.