[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 1, 2004
THOMAS K. KAHN
CLERK

_____

No. 03-16360

_____

D. C. Docket No. 03-80097 CV-LRJ

RICHARD TROIANO,
HAROLD COUSMINER, et al.,

Plaintiffs-Appellants,

versus

SUPERVISOR OF ELECTIONS IN
PALM BEACH COUNTY, FLORIDA,
Theresa LePore,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(September 1, 2004)**

Before BLACK and MARCUS, Circuit Judges, and SMITH[*], District Judge.

MARCUS, Circuit Judge:

_____

[*]Honorable Fern M. Smith, United States District Judge for the Northern District of California, sitting by designation.

The plaintiffs in this case represent visually impaired registered voters in Palm Beach County, Florida who sued Theresa LePore, Supervisor of Elections for Palm Beach County, under federal and state law in the United States District Court for the Southern District of Florida, for the County's failure to make available audio components in voting booths to assist persons who are blind or visually impaired.

The district court[1] entered summary judgment in favor of LePore, finding that the plaintiffs did not have standing to assert their claims and that their claims were also moot.[2] After thorough review, we agree that the case is moot, because, on this record, the requested audio components have been furnished by the defendant and will be available in all the County's voting precincts in upcoming elections. Accordingly, we affirm the dismissal of the cause for lack of subject matter jurisdiction.

---

[1]Chief United States Magistrate Judge Linnea R. Johnson, presiding in the case by consent of parties in the case pursuant to 28 U.S.C. § 636(c), entered the order.

[2]The district court's finding of mootness was embodied in an order granting the defendant's motion for summary judgment. Subject matter jurisdiction is appropriately dealt with by means of a motion to dismiss under Federal Rule of Civil Procedure Rule 12(b)(1), and we will treat the district court's summary judgment ruling as if it were a ruling on a Rule 12(b)(1) motion. See United States v. Blue Cross & Blue Shield of Ala., Inc., 156 F.3d 1098, 1101 n.7 (11th Cir. 1998); Tuley v. Heyd, 482 F.2d 590, 593 (5th Cir.1973) ("It is a familiar principle that the label a district court puts on its disposition of a case is not binding on a court of appeals.") (The Eleventh Circuit has adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).)

I

        The relevant facts are straightforward and largely undisputed. Richard Troiano, Harold Cousminer, Allen Preston, Dave Evans, and the class of persons they represent are visually impaired individuals who are registered to vote in Palm Beach County elections. The defendant, Theresa LePore, is the Palm Beach County Supervisor of Elections, an elected official responsible for administering the election process in the County. Palm Beach County has approximately 725,000 registered voters, divided into 642 voting precincts.

        After the 2000 elections, the State Legislature decertified the punch card voting machines that had been used in the County, making it necessary for the County to purchase and install a new voting machine system. On October 16, 2001, LePore signed an agreement with Sequoia Voting Systems, Inc. to purchase 3,900 voting units. With this purchase, 750 special auxiliary devices were also provided at no additional charge. Designed by Sequoia Voting Systems, these devices allow visually impaired persons to vote independently for the first time in the history of Palm Beach County. Each machine has a control pad, headphone, and audio component that reads the ballot aloud. After hearing the ballot choices, voters can press the appropriate buttons on the control pad to make their voting

3

selections. Thus, the Sequoia machines enable visually impaired people to vote without assistance from anyone else.

Like all election equipment used in Florida, the audio component had to be certified by the Florida Department of State Division of Elections before it could be used. Due to this requirement, LePore could not use or demonstrate the use of these components, or train poll workers to use the components, until the certification process was completed. Certification of the Sequoia audio component was not completed until August 2002.

Once the audio component was certified, LePore programmed one machine in each precinct to facilitate the use of the audio component, and also sent written instructions to poll workers regarding its use. She also began training poll workers in the use of this equipment before the primary elections in September 2002. LePore hires and trains some 5,000 poll workers for each election and must begin training four to five weeks in advance of election day. Precinct clerks, assistant clerks, and precinct advisors receive a minimum of six hours training, while inspectors and deputies receive at least three hours. As part of this training, poll workers receive a voting manual and view three training videos, one of which instructs poll workers on how to serve persons with disabilities. Two poll workers in each of the County's 642 precincts are trained to use the audio component. It

4

takes between ten minutes and one hour to train each worker. In all, the Supervisor's Office conducts between sixty-five and seventy-five training sessions, six days a week, to provide the necessary training for County poll workers.

To use the audio component, poll workers simply plug in the headphones and keypad and switch the voting machine into audio mode. It takes only seconds to switch the machine into audio mode. No programming is required at the individual precincts by the poll workers, since one machine per precinct was programmed to use the audio component for the September 2002 election.

Prior to the September 2002 election, LePore and representatives from Sequoia demonstrated the capabilities of the audio component on the new Sequoia voting system and provided information to the Coalition for Independent Living Options, the National Federation of the Blind, and other organizations that provide services to the visually impaired. At the demonstrations, LePore indicated that the audio component would be available for use at each precinct in all future elections, including the September 2002 election.

During the September 2002 primary election, however, three of the named Plaintiffs could not use the audio components, two (Preston and Cousminer) because they were told the equipment was unavailable, and one (Evans) because

5

the poll workers could not set up the equipment properly. LePore concluded that there had not been enough time to properly train all the poll workers and instructed the precinct clerks to call her office for over-the-phone instructions in case there were any questions regarding the use of the equipment. A computer programmer from the voting machine company was able to determine that in the September 2002 primary election two individuals in Palm Beach County used the audio component to vote and two others triggered the audio mode, but did not complete the voting process.

The ballot styles were recorded, proofread, and available for the November 5, 2002 election, having been prepared by an independent company. However, after a meeting with her staff, LePore elected to use the audio components only in the four main regional offices rather than in each of the 642 precincts. The ballot for this election was the longest her office had ever dealt with. LePore had members of the staff read the ballot out loud, and concluded that if the audio component was used in every precinct, non-impaired voters would have to wait too long for the people using the audio component to finish. To inform the public of her decision to limit access to the audio components, LePore sent media announcements to over 200 different groups, including print and electronic media, political parties, and elected officials. The announcement was mailed on October

6

28, 2002, eight days before the election. LePore also instructed poll workers to announce that the audio components were available at each of the four main regional offices. In addition, she contacted SpecTran, a transportation service for the disabled, to arrange for transportation to the four polling places, and instructed poll workers to inform voters of this service.

Prior to the November 5, 2002 election, plaintiff Evans went to the Supervisor of Elections Facility to receive instructions on how to use the audio component equipment to ensure that he could assist the poll workers at his precinct on Election Day. At the facility, he was informed that he could cast his ballot early using the audio component. However, when he actually tried to vote on November 5, the poll worker did not know how to switch the machine into audio mode or start the audio voting process, so Evans had to wait for someone else to switch the machine into audio mode. The actual switching only took thirty seconds, but it took Evans between twenty and twenty-five minutes to listen to the voting instructions and the entire November 5, 2002 ballot and cast his vote.

On the same day, plaintiff Cousminer was told at the polls that there was no audio equipment available at his precinct. Poll workers did not inform Cousminer that there was audio equipment available at four other locations or that transportation to these locations was available. Cousminer tried to use a

7

magnifying glass to read the ballot, but it was inadequate and his wife had to assist him in voting. Likewise, plaintiff Preston was told that the equipment was unavailable and not informed about the transportation to alternative locations. He too tried to use a magnifying glass, which proved inadequate. Preston was forced to use a sample ballot he had prepared before the election and hope that it was in the same order as the actual ballot.

Prior to the November 2002 election, plaintiff Troiano called his polling place to inform them that he was blind. He was not advised that his precinct would not have the equipment available or that it would only be available at four locations. On Election Day, poll workers told Troiano that the precinct was supposed to receive audio equipment but had not. They did not tell him that transportation was available to take him to the alternative locations. Instead, two poll workers -- one Democrat, one Republican -- had to read the ballot to him. Because they did not want to read the entire text of the amendments, they only read summaries, and Troiano cast his vote based only on the summaries.

After the November 5, 2002 election, LePore decided on her own to use the audio component in all precincts in every future election regardless of the length of the ballot. According to LePore, "[t]he whole audio process was new to everybody in the state and we had things that we didn't know, what-if scenarios

8

that we didn't know until we actually went through it."  Although LePore thought that she was not required to provide this equipment until 2006, when local regulations require its use, she decided to provide it earlier because of a professed commitment to provide aid to persons with disabilities.  She has averred that even if an election ballot is as long or longer than the November 5, 2002 ballot, she would still use the audio component.

Most significantly, since the November 2002 election, audio-equipped voting machines actually have been in place in every precinct in every election, including those conducted on February 11, 2003 and on February 18, 2003, shortly after this lawsuit was filed on February 10, 2003, but before LePore was served with process on February 19.  In addition to these two elections, there have been at least five additional municipal elections in which the audio component was available everywhere, including the election conducted on March 11, 2003, which required seventeen different ballots for seventeen different municipal elections.  However, there have been no countywide elections since November 5, 2002.

On February 10, 2003, Cousminer, Evans, Preston, and Troiano filed a four-count complaint against LePore, based on her failure to make adequately available the auxiliary devices to assist visually impaired persons to vote secretly.  In Count One, the plaintiffs specifically alleged discrimination in violation of the

9

Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. Count Two alleged discrimination in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 794. In Count Three, the plaintiffs sought declaratory relief. Finally, in Count Four, the plaintiffs also claimed that LePore violated Fla. Stat. § 101.71(2), for failing to timely notify voters of the availability of accessible voting machines at alternative locations. On May 1, 2003, LePore moved to dismiss the complaint, which the district court granted as to Count Four only. Thereafter, the district court certified as a class any blind or visually impaired Palm Beach County residents who are registered to vote, but unable to independently read election ballots.

Ultimately, both parties filed cross-motions for summary judgment, and on November 3, 2003, the court granted defendant LePore's motion, concluding both that the case was moot and that the plaintiffs lacked standing. See Troiano v. LePore, No. 03-80097, slip. op. at 7-13 (S.D. Fla. Nov. 3, 2003). The plaintiffs sought reconsideration, but the application was denied. This appeal ensued.

II

10

Mootness is the threshold question in this case.[3]  A moot case is nonjusticiable and Article III courts lack jurisdiction to entertain it.  As we have explained:

> Article III of the Constitution limits the jurisdiction of the federal courts to the consideration of "Cases" and "Controversies." In turn, the "case or controversy" constraint imposes on federal courts a "dual limitation" known as "justiciability." The doctrine of justiciability prevents courts from encroaching on the powers of the elected branches of government and guarantees that courts consider only matters presented in an actual adversarial context. . . .
>
> The doctrine of mootness derives directly from the case-or-controversy limitation because an action that is moot cannot be characterized as an active case or controversy.  A case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.  As this Court has explained, put another way, a case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief.  If events that occur subsequent to the filing of a lawsuit or an appeal deprive the court of the ability to give the plaintiff or appellant meaningful relief, then the case is moot and must be dismissed.  Indeed, dismissal is required because mootness is jurisdictional. Any decision on the merits of a moot case or issue would be an impermissible advisory opinion.

Al Najjar v. Ashcroft, 273 F.3d 1330, 1335-36 (11th Cir. 2001) (per curiam) (citations and internal quotation marks omitted).  Or, as the Supreme Court has put it, "[t]he requisite personal interest that must exist at the commencement of the

---

[3]We need not and do not address the companion jurisdictional question of standing, because if a case is moot, plainly we lack subject matter jurisdiction to evaluate the merits on that ground alone.

litigation (standing) must continue throughout its existence (mootness)." Arizonans for Official English v. Arizona, 520 U.S. 43, 68 n.22, 117 S. Ct. 1055, 1069 n.22, 137 L. Ed. 2d 170 (1997) (quoting United States Parole Comm'n v. Geraghty, 445 U.S. 388, 397, 100 S. Ct. 1202, 1209, 63 L. Ed. 2d 479 (1980)).

As we have previously observed, "[b]ecause the judiciary is unelected and unrepresentative, the Article III case-or-controversy limitation, as embodied in justiciability doctrine, presents an important restriction on the power of the federal courts." Socialist Workers Party v. Leahy, 145 F.3d 1240, 1244 (11th Cir. 1998). This requirement goes to the heart of our constitutional doctrine of the separation of powers and the proper role of the judiciary. Indeed, the Supreme Court has said that "the 'case or controversy' requirement defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded. The several doctrines that have grown up to elaborate that requirement are 'founded in concern about the proper -- and properly limited -- role of the courts in a democratic society.'" Allen v. Wright, 468 U.S. 737, 750, 104 S. Ct. 3315, 3324, 82 L. Ed. 2d 556 (1984) (quoting Warth v. Seldin, 422 U.S. 490, 498, 95 S. Ct. 2197, 2205, 45 L. Ed. 2d 343 (1975)).

Whether a case is moot is a question of law that we review de novo. Christian Coalition of Ala. v. Cole, 355 F.3d 1288, 1290 (11th Cir. 2004) (citing

United States v. Fla. Azalea Specialists, 19 F.3d 620, 621 (11th Cir. 1994)).  A district court's findings of fact, however, are reviewed for clear error.  United States v. Snyder, 291 F.3d 1291, 1295 (11th Cir. 2002).

The trial court in this case concluded that the case was mooted by events that occurred subsequent to the filing of the lawsuit -- namely, the undisputed availability of the audio equipment in every precinct and for every election.  See slip. op. at 12-13.  The plaintiffs suggest, however, that these actions do not moot the case because provision of the new equipment was a voluntary cessation of objectionable conduct that the defendant could resume at any time after the termination of this suit.

The doctrine of voluntary cessation provides an important exception to the general rule that a case is mooted by the end of the offending behavior.  The Supreme Court has written that "[m]ere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave 'the defendant . . . free to return to his old ways.'"  United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 203, 89 S. Ct. 361, 364, 21 L. Ed. 2d 344 (1968) (quoting United States v. W.T. Grant Co., 345 U.S. 629, 632, 73 S. Ct. 894, 897, 97 L. Ed. 1303 (1953)).  "It long has been the rule that 'voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and

determine the case, i.e., does not make the case moot.'" Sec'y of Labor v. Burger King Corp., 955 F.2d 681, 684 (11th Cir. 1992) (quoting W.T. Grant Co., 345 U.S. at 632, 73 S. Ct. at 897).

However, there is an important exception to this important exception, when there is no reasonable expectation that the voluntarily ceased activity will, in fact, actually recur after the termination of the suit. See W. T. Grant Co., 345 U.S. at 633, 73 S. Ct. at 897 ("The case may nevertheless be moot if the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated." (internal citation and quotation marks omitted)). Moreover, when the defendant is not a private citizen but a government actor, there is a rebuttable presumption that the objectionable behavior will not recur. See Coral Springs St. Sys., Inc. v. City of Sunrise, 371 F.3d 1320, 1328-29 (11th Cir. 2004) ("[G]overnmental entities and officials have been given considerably more leeway than private parties in the presumption that they are unlikely to resume illegal activities."); Ragsdale v. Turnock, 841 F.2d 1358, 1365 (7th Cir. 1988) ("[C]essation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties.").

Indeed, it has been suggested that

14

> Courts are more likely to trust public defendants to honor a professed commitment to changed ways; individual public defendants may be replaced in office by new individuals, with effects that have little parallel as to private defendants; remedial calculations may be shaped by radiations of public interest; administrative orders may seem to die or evolve in ways that leave present or future impact unclear.

13A Wright et al., Federal Practice and Procedure § 3533.7, at 351 (2d ed. 1984); see also id. at 354 ("Courts are more apt to trust public officials than private defendants to desist from future violations." (citing Preiser v. Newkirk, 422 U.S. 395, 402-03, 95 S. Ct. 2330, 2334-35, 45 L. Ed. 2d 272 (1975))).[4]

When government laws or policies have been challenged, the Supreme Court has held almost uniformly that cessation of the challenged behavior moots the suit. See, e.g., Lewis v. Cont'l Bank Corp., 494 U.S. 472, 474, 110 S. Ct. 1249, 1252, 108 L. Ed. 2d 400 (1990); Princeton Univ. v. Schmid, 455 U.S. 100, 103, 102 S. Ct. 867, 869, 70 L. Ed. 2d 855 (1982) (per curiam); Kremens v. Bartley, 431 U.S. 119, 128-29, 97 S. Ct. 1709, 1715, 52 L. Ed. 2d 184 (1977); Diffenderfer v. Cent. Baptist Church, Inc., 404 U.S. 412, 415, 92 S. Ct. 574, 576,

---

[4]Other Circuits have also uniformly held that the repeal of a government statute or ordinance will moot a challenge to that policy. See Fed'n of Adver. Indus. Representatives, Inc. v. City of Chicago, 326 F.3d 924, 930 (7th Cir.2003); Citizens for Responsible Gov't v. Davidson, 236 F.3d 1174, 1182 (10th Cir.2000); D.H.L. Assoc. v. O'Gorman, 199 F.3d 50, 55 (1st Cir. 1999); Nat'l Black Police Ass'n v. Dist. of Columbia, 108 F.3d 346, 349 (D.C. Cir. 1997); Ky. Right to Life, Inc. v. Terry, 108 F.3d 637, 644-45 (6th Cir. 1997); Native Village of Noatak v. Blatchford, 38 F.3d 1505, 1510 (9th Cir. 1994); Assoc. Gen. Contractors of Conn., Inc. v. City of New Haven, 41 F.3d 62, 66 (2d Cir. 1994).

15

30 L. Ed. 2d 567 (1972). The Court has rejected an assertion of mootness in this kind of challenge only when there is a substantial likelihood that the offending policy will be reinstated if the suit is terminated. See City of Mesquite v. Aladdin's Castle, 455 U.S. 283, 289 & n.11, 102 S. Ct. 1070, 1074-75 & n.11, 71 L. Ed. 2d 152 (1982) (rejecting the argument that a challenge to a city statute was moot, even though the statute had been repealed, because there was "no certainty" that the law would be reenacted and the City had, in fact, announced an intention to reenact it if the Court threw out the case).

In this Circuit as well, a challenge to governmental action has been mooted when the alleged wrongdoers have ceased the allegedly illegal behavior and the court can discern no reasonable chance that they will resume it upon termination of the suit. We have held, for example, a challenge to a government policy moot when it has been replaced by a new policy that "appears to have been the result of substantial deliberation" on the part of the alleged wrongdoers and has "been consistently applied" in the recent past. See Jews for Jesus, Inc. v. Hillsborough County Aviation Auth., 162 F.3d 627, 629 (11th Cir. 1998). Thus, in Jews for Jesus, we found moot a controversy in which an airport had lifted a ban on the distribution of literature, thereby leaving the court no meaningful relief to give to a group challenging that policy on First Amendment and other grounds. Id. Indeed,

16

we concluded that the issue of whether the prior policy was constitutional was "a purely academic point" as there was "no 'reasonable expectation' that the challenged practice [would] resume after the lawsuit is dismissed." Id.

Likewise, in Saladin v. Milledgeville, the plaintiffs alleged that use of the word "Christianity" as part of its city seal violated the Establishment Clause. 812 F.2d 687 (11th Cir. 1987). The city stopped displaying the seal sometime after the litigation began. Id. at 693. Again, we held that

> there appears to be no remaining effect of the alleged violation regarding the display of the seal in those particular locations, nor does there appear to be any basis for believing that the City will break its word. There is nothing left for the court to do on those claims except declare that the practices are unconstitutional for the principle of the matter. Principle alone unaccompanied by a live case or controversy does not present a justiciable claim.

Id.

Similarly, in Christian Coalition of Alabama v. Cole, a panel of this Court found that a challenge to an advisory opinion from the Alabama Judicial Inquiry Commission ("JIC") regarding public statements by candidates for judicial office was moot. 355 F.3d at 1289. Notably, the JIC had withdrawn the advisory opinion, and although it had the power to reissue the opinion, we declined to apply the doctrine of voluntary cessation because we were satisfied that the plaintiffs had "every reason to believe that the JIC's representation [that it would not reissue

the opinion] is genuine, and can reasonably expect that the JIC will not issue another opinion preventing judges from answering the questionnaire at issue in this case." Id. at 1292-93. And most recently, in Coral Springs Street Systems, we held moot a challenge to a municipal sign ordinance because the ordinance had been repealed and we saw "no hint" that the city had any intention of reenacting it. 371 F.3d at 1324.[5]

In short, this Court has consistently held that a challenge to a government policy that has been unambiguously terminated will be moot in the absence of some reasonable basis to believe that the policy will be reinstated if the suit is terminated. In the absence of any such evidence, there is simply no point in allowing the suit to continue and we lack to power to allow it to do so.

In the case before us, the trial court found that "there is no factual basis to conclude that a 'reasonable expectation' exists that LePore will not have the audio component available in the future, which is what her office has done consistently even before this lawsuit was filed." Slip op. at 12. Again, we review a trial

---

[5]In an unpublished opinion in 2000, we also found moot a challenge to a city's sign ordinance when a moratorium had been placed on the ordinance before the commencement of the litigation, a new sign code had been enacted after substantial deliberation, and the City had adopted a formal resolution that it would not readopt any aspect of the old sign code that might violate the First Amendment. See Revolution Outdoor Adver., Inc. v. City of Casselberry, No. 00-10863, 234 F.3d 711 (table) (11th Cir., Sep. 29, 2000) (unpublished opinion); Revolution Outdoor Adver., Inc. v. City of Casselberry, No. 98-01344, slip op. at 6-7 (M.D. Fla. 2000).

court's findings of fact for clear error, United States v. Snyder, 291 F.3d 1291, 1295 (11th Cir. 2002), and our review of the record reveals no basis to believe that this finding of fact was erroneous, let alone clearly erroneous. LePore has not only ceased the allegedly illegal practice, she did so prior to receiving notice of the litigation. Her decision to implement the changes in the voting machines was well reasoned and her behavior prior to the beginning of this litigation provides ample evidence of her intent to provide audio components in all future elections. Although in November 2002, she briefly changed the policy of providing audio components in every precinct, she did so based on factors that are not likely to be present in the future, namely the lack of staff preparedness to handle the new machines. She has professed that the Sequoia audio device will be available in every precinct in future elections, regardless of the length of ballots or the degree of voter turnout.

Moreover, and equally important to our analysis, since making the decision to use audio components in every election, LePore has consistently followed this policy, and taken actions to implement it even prior to the beginning of the litigation. Thus, we can discern no hint that she has any intention of removing the accessible voting machines in the future.

This case stands in stark contrast to cases like W.T. Grant, where the defendants -- who were private actors rather than government entities -- were "shown to have settled into a continuing practice or entered into a conspiracy violative of antitrust laws" and the Supreme Court therefore said that it would "not assume that it has been abandoned without clear proof." 345 U.S. at 632 n.5, 73 S. Ct. at 897 n.5 (quoting United States v. Or. State Med. Soc'y, 343 U.S. 326, 333, 72 S. Ct. 690, 695-96, 96 L. Ed. 978 (1952)). The Court rejected the argument that the case was moot because of voluntary cessation of wrongdoing, because "[i]t is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." Id. (quoting Or. State Med. Soc'y, 343 U.S. at 333, 72 S. Ct. at 696). By contrast, in the case before us, both before and after the November 5, 2002 election, LePore's pattern of behavior proved her commitment to providing the audio components. For the November 5, 2002 election, she plainly tried to provide audio components and was unable to do so only because she faced too many administrative difficulties. As we see it, her decision to provide the audio equipment only in four locations for that election was a good-faith effort to deal with an administrative dilemma. More notably,

since the November 2002 election, Supervisor LePore has used the audio-equipped voting machines in every precinct and in every subsequent election.

Simply put, all of the available evidence (and it is considerable) -- and the square finding of fact by the district court -- suggest that LePore's furnishing of the audio components was genuinely intended to make elections consistently accessible to the visually impaired. We see no reason to believe that LePore implemented this policy in anticipation of litigation and no evidence that she is likely to remove the new machines in the future. Any quality problems with the training of staffers clearly resulted from the shortage of time to train the staff before the September and November 2002 elections, and are not likely to be repeated. The plaintiffs have not presented any evidence that there were similar problems in any of the elections subsequent to November 2002. As such, we are constrained to conclude that the practice at issue in this case has already been resolved and thus this controversy has become moot.

Our holding today in no way condones the bureaucratic problems displayed by some of the Palm Beach County poll administrators in the 2002 elections. However, the overwhelming evidence before us today (and the findings of the court below) make plain that no such mishaps are likely to recur in the future, because the special audio equipment is now available and has been available in

21

every precinct and we can see no reasonable possibility that it will be removed. The plaintiffs' demand for relief is moot. Accordingly, we affirm the dismissal of the cause for lack of subject matter jurisdiction.

**AFFIRMED.**