[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-10280
_____

D.C. Docket No. 1:07-cv-02764-RWS


JOHN DOE,

Plaintiff-Appellant,

versus

OFFICER WOOTEN,
in his individual capacity, et al.,

Defendants,

RICK STOVER,
in his individual and official capacities,
DIRECTOR, FEDERAL BUREAU OF PRISONS,
in his official capacity,

Defendants-Appellees.
_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(April 8, 2014)

Before PRYOR and MARTIN, Circuit Judges, and HONEYWELL,* District Judge.

MARTIN, Circuit Judge:

The Supreme Court has reminded us:

It is no small matter to deprive a litigant of the rewards of its efforts, particularly in a case that has been litigated up to this Court and back down again. Such action on grounds of mootness would be justified only if it were absolutely clear that the litigant no longer had any need of the judicial protection that it sought.

Adarand Constructors, Inc. v. Slater, 528 U.S. 216, 224, 120 S. Ct. 722, 726 (2000) (per curiam).

The case now before us began in 2007 and is here on its second trip to this Court. By this appeal, John Doe[1] challenges the District Court's order dismissing as moot his lawsuit alleging that two Federal Bureau of Prisons (BOP) officials violated his rights under the Eighth Amendment. After careful review and with the benefit of oral argument, we conclude that the defendants failed to demonstrate unambiguous termination of the challenged conduct. We therefore reverse the District Court's order and remand for further proceedings.

I.

Mr. Doe was convicted in the District of Columbia for violations of the D.C. Code and has since been incarcerated in various prisons run by the BOP. His

---

* Honorable Charlene Edwards Honeywell, United States District Judge for the Middle District of Florida, sitting by designation.

[1] Mr. Doe was granted leave to proceed under a pseudonym based on concerns for his safety.

2

complaint alleges the following facts, which on a motion to dismiss are accepted as true. Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents, 633 F.3d 1297, 1301 n.3 (11th Cir. 2011).

While Mr. Doe was incarcerated at the United States Penitentiary (USP) in Atlanta, a BOP officer coerced him into sexual relations. In 2004, Mr. Doe cooperated with a federal investigation of the officer by wearing a wire and engaging the officer in conversation about their earlier sexual interactions. The officer resigned as a result of the investigation. In return for his role in the investigation, Mr. Doe was promised that he would be kept safe and would be transferred to a lower security prison.

Soon after the investigation ended, Mr. Doe was transferred to a lower security BOP facility in Alabama for several months. However, he was then transferred to USP Coleman, a high-security facility in Florida. Mr. Doe filed a confidential grievance about his placement, which explained his situation. But the BOP failed to use the confidential correspondence channels in addressing this grievance, and sent its response through standard prison mail. As a result, staff at USP Coleman read Mr. Doe's grievance and learned of his role as an informant at USP Atlanta against another BOP officer. Within hours of the USP Coleman staff learning this about Mr. Doe, he alleges he was put in a cell with two known sexual offenders, who severely beat and assaulted him. Mr. Doe required hospitalization

3

as a result of this assault.  For his protection, he was then moved to the special housing unit, severely restricted housing where prisoners spend up to 23 ½ hours a day in their cells and cannot participate in programs available to the general population.

Mr. Doe was then transferred around to several high-security BOP locations, where he often ended up in the special housing unit for his protection because of threats of retaliation against him.  On one of these transfers, he was sent through and held at USP Atlanta until an officer there recognized the danger of retaliation against Mr. Doe and had him moved.

While at one of these high-security facilities, USP Victorville, Mr. Doe filed another request for transfer to a low- or medium-security BOP facility based on his cooperation, and resulting threats and retaliation.  The USP Victorville warden granted his grievance.  Mr. Doe's attorney then contacted Rick Stover, a Senior Designator at the BOP's Designation and Sentence Computation Center (DSCC), which makes all transfer decisions and housing assignments.  Mr. Stover responded that he had all the information he needed and was aware of Mr. Doe's specific risk.

But Mr. Doe was not transferred to a lower security prison.  He was instead first sent to the Federal Transit Center in Oklahoma City and then back to USP Atlanta.  In Atlanta, Mr. Doe was beaten by a BOP officer so badly that he

4

required a trip to the emergency room.  After returning from the hospital he was briefly placed in the special housing unit of USP Atlanta and then sent to another high-security facility, USP Big Sandy in Kentucky.  At USP Big Sandy, a little less than a year later, he was again attacked, this time by a fellow inmate who Mr. Doe says referred to "what you did in Atlanta."  Soon after the attack in Kentucky, Mr. Doe filed this lawsuit.

Even while this suit was pending, Mr. Doe was transferred to at least four more high-security BOP prisons, despite two wardens' recommendations that he be moved to a medium-security facility.  During these transfers he suffered two more attacks purportedly linked to his reputation as an informant.  After the second attack, Mr. Doe tried to take his own life.

Mr. Doe's lawsuit alleged that Mr. Stover and the then-Director of the BOP, Harley Lappin, violated his Eighth Amendment rights against cruel and unusual punishment by being deliberately indifferent to the protection he required after he assisted the BOP in the investigation of its own officer in Atlanta.[2]  After years of

---

[2] The two remaining individual defendants in this case are Mr. Stover, a senior member of the BOP's DSCC, and current BOP Director Charles Samuels, Jr.  Mr. Doe's remaining claims against them are in their official capacities only. Doe v. Wooten, 376 F. App'x 883, 884 (11th Cir. 2010) (per curiam) (affirming the District Court's grant of summary judgment to Mr. Stover in his individual capacity).  For simplicity, we refer to these two defendants collectively as the BOP.  Contrary to the BOP's arguments, Messers. Stover and Samuels—or any successors later substituted automatically pursuant to Fed. R. Civ. P. 25(d)—have the authority through their positions at the BOP to implement the injunctive relief Mr. Doe seeks.  This Court has already affirmed that the violations alleged here are appropriate for injunctive relief, Doe, 376 F. App'x

litigation, including an appeal to this Court, the District Court scheduled the case for trial to begin on April 16, 2012. Mr. Doe sought (1) an injunction preventing the BOP from placing him in or transporting him through the BOP facility in Atlanta; and (2) an injunction requiring the BOP to have Mr. Doe removed from a high-security BOP facility and placed either in a medium-security BOP facility, a state prison facility, or in a BOP witness protection program.

Days before the scheduled trial date, the BOP moved to dismiss the case. The BOP said it had taken action, just before filing the motion, that rendered Mr. Doe's claims moot. The motion to dismiss included an affidavit explaining that Mr. Doe's record in the BOP's inmate computer system now had a "Do Not Erase" entry that Mr. Doe should not be assigned to or transported through USP Atlanta. The affidavit also averred that the BOP had gotten an agreement to allow the transfer of Mr. Doe to the custody of an unnamed state department of corrections. The BOP soon filed proof of Mr. Doe's transfer to the Colorado Department of Corrections.

Mr. Doe opposed the BOP's motion to dismiss, arguing that it had still failed to demonstrate that Mr. Doe would not be returned to a high-security BOP facility in the future. While he acknowledged that his recent move to the Colorado prison

---

at 884, and on remand the District Court found the BOP is capable of providing Mr. Doe with the requested relief.

6

and the instructions entered into his file were positive developments that mitigated

the danger to him, Mr. Doe argued he was still entitled to injunctive relief to

prevent the BOP from returning him to a high-security federal prison absent a

material change in circumstances justifying the transfer.

After briefing, the District Court granted the BOP's motion to dismiss,

relying heavily on the principle that a government actor that voluntarily ceases

objectionable behavior enjoys a rebuttable presumption that it will not recur.  The

District Court found the controversy was moot because Mr. Doe failed to

overcome the presumption by showing "a substantial likelihood" that he would be

returned to a high-security BOP facility.

Mr. Doe then filed this appeal.

## II.

A District Court's decision on mootness is a question of law we review de

novo.[3]  See, e.g., Troiano v. Supervisor of Elections, 382 F.3d 1276, 1282 (11th

Cir. 2004).  It is well settled that when a defendant chooses to end a challenged

practice, this choice does not always deprive a federal court of its power to decide

---

[3] The BOP contends that Mr. Doe waived several of his appeal arguments challenging the District Court's mootness determination because they were not raised expressly before the District Court.  We reject this BOP argument because "[w]hen a party presents something on appeal that is part and parcel of its original argument, then we will consider it." Info. Sys. & Networks Corp. v. City of Atlanta, 281 F.3d 1220, 1227 n.7 (11th Cir. 2002) (internal quotation marks omitted).  Even if we were to credit the BOP's characterization of Mr. Doe's arguments, we would still reach the mootness issues presented here, because we have an independent obligation to assure ourselves of the justiciability of a controversy under Article III. See Ouachita Watch League v. Jacobs, 463 F.3d 1163, 1170 (11th Cir. 2006).

the legality of the practice. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189, 120 S. Ct. 693, 708 (2000). "[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Id. at 190, 120 S. Ct. at 709. The Supreme Court has applied this same standard in cases involving government actors. See, e.g., Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 719, 127 S. Ct. 2738, 2751 (2007); Adarand Constructors, 528 U.S. at 224, 120 S. Ct. at 726.

In keeping with these Supreme Court decisions, this Court also employs this standard, even for government actors. Harrell v. Fla. Bar, 608 F.3d 1241, 1268 (11th Cir. 2010) (reaffirming the principle that the initial "heavy" burden remains with the government actor to show "that it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur" (internal quotation marks omitted)). Because of the unique characteristics of public defendants, Troiano, 382 F.3d at 1283, this Court often gives government actors "more leeway than private parties in the presumption that they are unlikely to resume illegal activities," Coral Springs St. Sys., Inc., v. City of Sunrise, 371 F.3d 1320, 1328–29 (11th Cir. 2004). We have called this leeway that we extend to government actors a "rebuttable presumption," Troiano, 382 F.3d at 1283, or a "lesser burden," Rich

8

v. Sec'y, Fla. Dep't of Corr., 716 F.3d 525, 531 (11th Cir. 2013). This presumption is particularly warranted in cases where the government repealed or amended a challenged statute or policy—often a clear indicator of unambiguous termination. See Troiano, 382 F.3d at 1283–84.

In applying this presumption, we have held that once a government actor establishes unambiguous termination of the challenged conduct, the controversy "will be moot in the absence of some reasonable basis to believe that the policy will be reinstated if the suit is terminated." Id. at 1285. Consistent with our precedent, we emphasize that the government actor is entitled to this presumption only after it has shown unambiguous termination of the complained of activity. Harrell, 608 F.3d at 1267–68 ("[W]e are unable to say that the Board, through its decision, 'unambiguously terminated' the challenged application of Rule 4-7.2(c)(2) to Harrell's slogan, as required to invoke the presumption we identified in Troiano.").

In conducting both the initial inquiry of unambiguous termination as well as the following evaluation about whether there is a reasonable basis the challenged conduct will recur, this Court has considered the following factors: (1) "whether the termination of the offending conduct was unambiguous;" (2) "whether the change in government policy or conduct appears to be the result of substantial deliberation, or is simply an attempt to manipulate jurisdiction;" and (3) "whether

the government has 'consistently applied' a new policy or adhered to a new course of conduct." Rich, 716 F.3d at 531–32 (quoting Nat'l Ass'n of Bds. of Pharmacy, 633 F.3d at 1310). The timing and content of the cessation decision are also relevant in evaluating whether the defendant's stopping of the challenged conduct is sufficiently unambiguous. Id. We are also "more likely to find a reasonable expectation of recurrence when the challenged behavior constituted a continuing practice or was otherwise deliberate." Atheists of Fla., Inc. v. City of Lakeland, 713 F.3d 577, 594 (11th Cir. 2013) (internal quotation marks omitted). These factors are not exhaustive and the analysis may vary depending on the facts and circumstances of a particular case. See Md. Cas. Co. v. Pac. Coal & Oil Co., 312 U.S. 270, 273, 61 S. Ct. 510, 512 (1941) (noting the difficulty in fashioning a precise test of universal application for determining whether a request for declaratory relief has become moot).

     With this legal framework in mind, we now turn to the mootness issue presented here.

B.

We will first consider whether the District Court applied the correct legal standard. Second we must decide whether Mr. Doe's request for injunctive relief prohibiting his return to a high-security BOP facility is moot.

The District Court, quoting Troiano, described the applicable legal standard by saying "an assertion of mootness involving government actors will only be rejected 'where there is a substantial likelihood that the offending policy will be reinstated if the suit is terminated.'" But while it is true that this language does appear in Troiano, 382 F.3d at 1283–84, this is not the standard we applied in Troiano or in later cases involving voluntary cessation by government actors. Highlighting the condition precedent, we held in Troiano that "a challenge to a government policy that has been unambiguously terminated will be moot in the absence of some reasonable basis to believe that the policy will be reinstated if the suit is terminated." Id. at 1285 (emphasis added). In other words, the government is—and always has been—required to justify application of the presumption before benefiting from it.

The District Court skipped this crucial first step by failing to require the government to shoulder its initial burden and therefore improperly shifting the burden to Mr. Doe. And in any event, the District Court applied the wrong standard for rebutting the government actor's presumption. The District Court

11

called upon Mr. Doe to show a "substantial likelihood" that the government conduct would resume, when instead the correct standard is a "reasonable basis to believe that the policy will be reinstated if the suit is terminated." Id.

When we apply the correct legal standard to the facts of Mr. Doe's case, we conclude that his request for injunctive relief is not moot. The BOP has not met its "formidable" or "heavy" burden of establishing "that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur" or that the challenged conduct has been unambiguously terminated. Friends of the Earth, Inc., 528 U.S. at 189–90, 120 S. Ct. at 708–09; Harrell, 608 F.3d at 1267–68. It is true that Mr. Doe has now been moved to a state facility. However, given the facts of this case, considered in light of the factors this Court has reviewed in deciding earlier voluntary cessation cases, the BOP has not met its initial burden to show Mr. Doe will not be returned to a high-security BOP facility.

The mere fact that the BOP transferred Mr. Doe to the Colorado State Corrections system simply does not show that the BOP has unambiguously terminated its pattern of transferring Mr. Doe to one high-security prison after another. We note that the BOP has never said Mr. Doe will not be transferred back to a high-security facility. Hardwick v. Brinson, 523 F.2d 798, 800 (5th Cir. 1975) ("[C]ounsel for defendants were unable to advise that appellant would not be returned to the Reidsville Prison. Thus the same alleged conduct which appellant

12

complains of may recur.");[4] accord Rich, 716 F.3d at 532 (noting Florida has "never promised not to resume the prior practice" (internal quotation marks omitted)); Jager v. Douglas Cnty. Sch. Dist., 862 F.2d 824, 833–34 (11th Cir. 1989) (rejecting mootness argument where no formal policy was adopted and defendants never promised not to resume the prior practice).  Instead the BOP makes indirect statements about how the record does not show any evidence that Mr. Doe will be moved.  These statements do not carry the day for the BOP, because it is the BOP's burden to show that Mr. Doe will not be moved, not Mr. Doe's burden to show he will.  Friends of the Earth, Inc., 528 U.S. at 190, 120 S. Ct. at 709; Harrell, 608 F.3d at 1267–68.

Our review of the record leads us to conclude that the BOP cannot meet this burden.  Mr. Doe's assignment to a state facility is not permanent and is subject to review every two years.  The BOP agreement with Colorado could change for any number of unrelated reasons requiring Mr. Doe's reassignment—fiscal budgets, political will, or Mr. Doe's behavior among them.  The BOP has not identified any evidence in the record that could support a contrary finding, and our own review has revealed none.  See Rich, 716 F.3d at 532 ("There is nothing to suggest that

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.  Id. at 1209.

13

Florida will not simply end the new kosher meal program at some point in the future, just as it did in 2007.").

To the contrary, the fact that Mr. Doe has been transferred repeatedly over a period of years supports a finding of likely recurrence. See Atheists of Fla., Inc., 713 F.3d at 594. This circumstance distinguishes Mr. Doe's case from one like Preiser v. Newkirk, where "[a]ll of the developments since the original challenged transfer" showed a pattern of changed conduct rather than "a mere voluntary cessation of allegedly illegal conduct" on the eve of trial. 422 U.S. 395, 401–02, 95 S. Ct. 2330, 2334–35 (1975) (internal alteration and quotation marks omitted). In Newkirk, the prison system promptly addressed the prisoner's concern after one offending transfer, making a notation in his file to counteract the effect of the disputed transfer and then returning him to his original housing placement, as well as making a second favorable transfer at a later time. Id. at 402, 95 S. Ct. at 2334–35. For Mr. Doe, the BOP has for years transferred him to objectionable facilities. Indeed, this practice continued even after he filed suit. See Nat'l Ass'n of Bds. of Pharmacy, 633 F.3d at 1311 (considering the fact that "the Board of Regents made similar promises before . . . and failed to keep them, prompting the current law suit").

Further, neither the timing nor the substance of the BOP's decision indicate an unambiguous termination. Harrell, 608 F.3d at 1266. After years of litigation

14

and questionable transfer decisions, the BOP suddenly changed its position days before Mr. Doe's trial was set to begin. This timing suggests a change was made simply to deprive the District Court of jurisdiction. Compare Troiano, 382 F.3d at 1285 (elections supervisor made changes even before lawsuit was filed), with Harrell, 608 F.3d at 1267 ("[T]he Board took up the matter of Harrell's advertisements only at the urging of the Bar's counsel after this litigation had commenced . . . ."). The BOP's affidavit itself indicates that the state transfer decision was based on "recent[] review" of Mr. Doe's status. The record also evidences that the BOP was able to make arrangements for Mr. Doe's transfer to Colorado in a matter of months or less, which is a remarkably short period of time after years of inaction. This strongly suggests that the most recent transfer of Mr. Doe was motivated by short-term convenience rather than long-term policy.

As for the substance of the decision, the BOP's documents show that the reason given for Mr. Doe's transfer to state custody was not his safety, but purportedly "to ensure the safety and orderly running of" USP Coleman II. The transfer request also gives the reason for Mr. Doe's move as his failure "to maintain any extended period of good adjustment in the High level facilities available in the Bureau of Prisons." On the record before us, the reasons given by the BOP for Mr. Doe's move do not establish that it intended to respond to Mr. Doe's concerns. And there is simply no indication that the BOP "intends to hold

15

steady in its revised . . . course." Harrell, 608 F.3d at 1266.  As we have noted, the BOP has told us nothing about how Mr. Doe's future transfers will or should be evaluated.  See Nat'l Ass'n of Bds. of Pharmacy, 633 F.3d at 1311 (noting in finding that infringing activities by professor had not been unambiguously terminated that "canceling the August review course did not bar a future course").

Neither is there evidence of any substantial deliberation.  The BOP does not explain why it decided to make the transfer now, when it had failed to do so earlier.  We are mindful that Mr. Doe had been recommended for transfer to medium-security BOP facilities by BOP wardens going as far back as 2006.  See id. at 1312 (finding reasonable basis to conclude infringement might continue where counsel did not provide any reasoned basis for the voluntary cessation).  "As a result, we have no idea whether the [BOP's] decision was 'well-reasoned' and therefore likely to endure."  Harrell, 608 F.3d at 1266–67 ("[I]f a governmental entity decides in a clandestine or irregular manner to cease a challenged behavior, it can hardly be said that its 'termination' of the behavior is unambiguous.").  Throughout Mr. Doe's incarceration, the BOP has taken inconsistent positions about whether his conviction renders him ineligible, regardless of his good conduct or safety concerns, to be placed in anything but a high-security BOP facility.  In sum, the BOP's record on the placement of Mr. Doe shows more confusion and inconsistency than substantial deliberation.

16

Considering all the circumstances of Mr. Doe's case and applying the proper standard for evaluating voluntary cessation by a government actor, we conclude that the BOP failed to carry its burden to demonstrate unambiguous termination of the challenged conduct.  Mr. Doe's lawsuit is therefore not moot.

### III.

The District Court's order dismissing Mr. Doe's claims as moot is reversed and this case is remanded for further proceedings.

**REVERSED and REMANDED.**