# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT
_____

No. 06-2658
_____

| | | |
|---|---|---|
| Goss International Corporation, formerly known as Goss Graphic Systems, Inc., a Delaware corporation, | * * * * | |
| Plaintiff/Appellee, | * * | |
| v. | * * | |
| Man Roland Druckmaschinen Aktiengesellschaft, a German corporation; Man Roland, Inc., a Delaware corporation; Koenig & Bauer Aktiengesellschaft, a German corporation; KBA North America, Inc., a Delaware corporation, | * * * * * * * * | Appeal from the United States District Court for the Northern District of Iowa. |
| Defendants, | * * | |
| Tokyo Kikai Seisakusho, Ltd., a Japanese corporation; TKS (U.S.A.), Inc., a Delaware corporation, | * * * * | |
| Defendants/Appellants, | * * | |
| Mitsubishi Heavy Industries, Ltd., a Japanese corporation; MLP U.S.A., Inc., a Delaware corporation, | * * * * | |
| Defendants, | * * | |
| _____ | * * | |

The Government of Japan,         \*

                                           \*

    Amicus on Behalf of Appellants.   \*

————————

Submitted: September 28, 2006
Filed: June 18, 2007 (corrected 7/31/07)

————————

Before RILEY, SMITH, and BENTON, Circuit Judges.

————————

RILEY, Circuit Judge.

On December 3, 2003, a jury found Japanese-based Tokyo Kikai Seisakusho, Ltd. (TKS), liable to Goss International Corporation (Goss), under the Antidumping Act of 1916 (the 1916 Act), 15 U.S.C. § 72 (repealed 2004), which made it unlawful for foreign persons to sell imported articles within the United States at a price substantially less than the actual market value or wholesale price at the time of exportation, with the intent of destroying or injuring an industry in the United States. The judgment, inclusive of statutory treble damages, attorney fees, and costs, amounted to more than $35,000,000.

During the pendency of TKS's appeal, Congress prospectively repealed the 1916 Act. See Miscellaneous Trade & Technical Corrections Act of 2004, Pub. L. No. 108-429, § 2006, 118 Stat. 2434, 2597 (2004). Shortly thereafter, the Japanese government passed "The Special Measures Law concerning the Obligation to Return Profits Obtained pursuant to the Antidumping Act of 1916 of the United States, etc.,

Law No. 162, 2004"[1] (Special Measures Law), a clawback statute[2] allowing Japanese nationals to sue for the recovery of any judgment entered against them under the 1916 Act.

On June 15, 2006, the district court granted Goss's motion for preliminary injunction, prohibiting TKS from filing suit in Japan under the Special Measures Law. On June 19, 2006, TKS paid the judgment in full, and the district court entered a satisfaction of judgment on June 21, 2006. On June 23, 2006, TKS filed this interlocutory appeal. In light of the changed circumstances since the district court entered its preliminary injunction, we vacate the district court's preliminary injunction.

## I.    BACKGROUND

Goss and TKS both manufacture and supply newspaper printing presses and press additions. Goss was the major manufacturer of large printing presses in the United States for more than a century and enjoyed dominance in the United States printing press market into the late 1990s. Goss Int'l Corp. v. Man Roland

---

[1]Amerika gasshuukoku no 1916 nen no han futou renbai hou ni motoduki uketa rieki no henkan gimu tou ni kansuru tokubetsu sochi hou [Special Measures Law], Law No. 162 of 2004.

[2]A clawback statute is a countermeasure that enables defendants who have paid a multiple damage judgment in a foreign country to recover the multiple portion of that judgment from the plaintiff. See generally, Joseph E. Neuhaus, Note, Power to Reverse Foreign Judgments: The British Clawback Statute Under International Law, 81 Colum. L. Rev. 1097, 1097-98 (1981) (citing the Protection of Trading Interests Act, 1980, c.11, § 5 (U.K.)); Joseph P. Griffin, United States Antitrust Laws and Transnational Business Transactions: An Introduction, 21 Int'l Law. 307, 327 (1987) (discussing clawback legislation enacted by the United Kingdom, Australia, and Canada that allows companies which have paid treble damages under United States antitrust law judgments to "sue the successful plaintiff in the local courts for a return of all or a portion of the damages").

Druckmaschinen Aktiengesellschaft (Goss I), 434 F.3d 1081, 1084-85 (8th Cir.), cert. denied, 126 S. Ct. 2363 (2006).

In the 1970s, TKS began selling its presses and press additions in the United States. By the 1980s, TKS obtained contracts with large United States newspapers, including *The Wall Street Journal*, *The Washington Post*, and the *Newark Star-Ledger*. Between 1991 and 2000, TKS began "dumping" its products, that is, selling them in the United States at prices substantially below the market value of its similar products in Japan. During that period, TKS sold $125,000,000 worth of printing press additions in the United States. Goss, on the other hand, lost contracts because customers expected Goss to lower its prices to match TKS's prices. In 2000, Goss did not make a single printing press equipment sale. See id. at 1085.

In March 2000, Goss brought a civil action against TKS alleging violations of the 1916 Act. See id. at 1087. On December 3, 2003, a jury found in Goss's favor and awarded $10,539,949 in damages. See id. at 1087-88. The district court statutorily trebled the damages, pursuant to the 1916 Act, and entered judgment against TKS in the amount of $31,619,847, plus interest and costs. See id. at 1088. The district court also awarded $3,484,158 in attorney fees and expenses, and $681,475.05 in costs. TKS appealed.

On December 3, 2004, Congress repealed the 1916 Act. Because the repeal was prospective, it did not affect Goss's judgment. Japan considered the prospective repeal to be inconsistent with the United States's obligations under World Trade Organization (WTO) agreements.[3] Consequently, on December 8, 2004, Japan

---

[3]The United States, Japan, and the European Communities (EC) are members of the WTO, which is an international trade organization established in 1995 to administer trade agreements, provide a forum for trade negotiations, and handle trade disputes between member nations. In November 1998, the EC asked the WTO's Dispute Settlement Body (DSB) to establish a dispute settlement panel because of

pending litigation in the United States against EC entities under the 1916 Act. The EC argued the 1916 Act was inconsistent with WTO covered agreements, and therefore the United States breached its WTO obligations by failing to repeal the 1916 Act. Japan registered the same complaint in June 1999. The United States defended its position, insisting the trade effects of the 1916 Act were de minimis, and pointing out that in the eighty-two years since its passage, no money damages or other relief ever had been awarded under the 1916 Act. The DSB agreed to establish dispute panels to review the EC's and Japan's complaints.

In 2000, the dispute panels concluded (1) the 1916 Act violated WTO covered agreements, including the General Agreement on Tariffs and Trade 1994 (GATT), the Anti-dumping Agreement (the Agreement on Implementation of Art. VI of the GATT), and the WTO Agreement; and (2) benefits accruing to the EC and Japan under the WTO Agreement had been nullified or impaired. The panels' decisions recommended the United States "bring the 1916 Act into conformity with its obligations under the WTO Agreement." The DSB adopted the panels' decisions and authorized arbitration to determine a reasonable time period for the United States to implement the provisions of the panels' decisions.

The United States requested extensions to the implementation period, explaining more time was necessary for Congress to enact legislation repealing the 1916 Act. Japan and the EC agreed to the extensions on the condition "the proposal and the draft Bill specifically addressed the repeal of the Act and the effect of the repeal were applicable to all actions pending on the date of enactment of the repeal Act, and to all actions filed after the date of enactment." However, in June 2002, the EC and Japan reactivated arbitration when a bill was introduced in Congress providing for the *prospective* repeal of the 1916 Act.

In February 2004, the WTO arbitrators approved the suspension of concessions to the United States. The suspension allowed for, among other things, a level of nullification equal to the total amount of any final judgments and/or settlement claims awarded under the 1916 Act. See generally World Trade Organization Appellate Body Reports, 2000, United States–Anti-Dumping Act of 1916, http://www.wto.org/english/tratop_e/dispu_e/ab_reports_e.htm (last visited June 12, 2007).

enacted the Special Measures Law, a clawback statute authorizing Japanese corporations and/or Japanese nationals to sue in Japanese courts for recovery of the full amount of any judgment, plus interest, attorney fees and costs, awarded under the 1916 Act. Special Measures Law, art. 3, 6. The Special Measures Law holds any wholly-owned parent companies and subsidiaries of the party that prevailed under the 1916 Act jointly and severally liable for the clawback judgment. Id. Goss Graphic Systems Japan (Goss Japan), which is located in Tokyo, is a wholly-owned subsidiary of Goss.

On November 24, 2004, by stipulation of the parties, TKS agreed not to file a lawsuit under the Special Measures Law until after TKS exhausted its appeal in the antidumping action. The stipulation also required TKS to provide Goss fourteen days' notice of its intention to pursue a remedy under the Special Measures Law. On January 26, 2006, our court affirmed the jury verdict and damages award in the antidumping action, see Goss I, 434 F.3d at 1084, and on June 5, 2006, the United States Supreme Court denied TKS's petition for writ of certiorari, see Tokyo Kikai Seisakusho, Ltd. v. Goss Int'l Corp., 126 S. Ct. 2363 (2006).

The same day the Supreme Court denied TKS's petition, TKS notified Goss of its intent to file suit under the Special Measures Law. Goss filed a motion for preliminary and permanent antisuit injunction to prevent TKS "from usurping the Court's jurisdiction and frustrating the Court's judgment." On June 15, 2006, the district court issued a preliminary antisuit injunction enjoining TKS from filing suit under the Special Measures Law. Goss Int'l Corp. v. Tokyo Kikai Seisakusho, Ltd. (Goss P.I.), 435 F. Supp. 2d 919, 931 (N.D. Iowa 2006). On June 19, 2006, TKS paid the judgment in full, and the district court entered a satisfaction of judgment on June

On December 3, 2004, Congress repealed the 1916 Act, specifying the repeal "shall not affect any action under [the 1916 Act] that was commenced before the date of the enactment of this Act and is pending on such date." Pub. L. No. 108-429, § 2006(a)-(b), 118 Stat. 2434, 2597.

21, 2006. On August 9, 2006, pursuant to TKS's motion, the district court terminated TKS's bond stating, "[t]he supersedeas bond, which was posted to protect the original judgment of the court, cannot be held in a speculative fashion to protect a possible award for attorney fees and costs spent on a possible decision granting a permanent anti-suit injunction that may possibly be appealed."

## II.     DISCUSSION

### A.     Proper Standard for Issuance of a Foreign Antisuit Injunction

The propriety of issuing a foreign antisuit injunction is a matter of first impression for our circuit. Other circuits having decided the issue agree that "federal courts have the power to enjoin persons subject to their jurisdiction from prosecuting foreign suits." Kaepa, Inc. v. Achilles Corp., 76 F.3d 624, 626 (5th Cir. 1996); see Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 926 (D.C. Cir. 1984) (citing Cole v. Cunningham, 133 U.S. 107, 116-17 (1890)). The circuits are split, however, on the level of deference afforded to international comity in determining whether a foreign antisuit injunction should issue.

The First, Second, Third, Sixth, and District of Columbia Circuits have adopted the "conservative approach," under which a foreign antisuit injunction will issue only if the movant demonstrates (1) an action in a foreign jurisdiction would prevent United States jurisdiction or threaten a vital United States policy, and (2) the domestic interests outweigh concerns of international comity. See Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren, 361 F.3d 11, 17 (1st Cir. 2004) (adopting the "conservative approach," which questions "whether the foreign action either imperils the jurisdiction of the forum court or threatens some strong national policy" and "accords appreciably greater weight to considerations of international comity"); see also Gen. Elec. Co. v. Deutz AG, 270 F.3d 144, 161 (3d Cir. 2001) (same); Gau Shan Co. v. Bankers Trust Co., 956 F.2d 1349, 1355 (6th Cir. 1992) (same); China Trade & Dev. Corp. v. M.V. Choong Yong, 837 F.2d 33, 35-37 (2d Cir. 1987) (same); Laker Airways, 731 F.2d at 926-34 (same). Under the conservative approach, "[c]omity

dictates that foreign antisuit injunctions be issued sparingly and only in the rarest of cases." Gau Shan Co., 956 F.2d at 1354 (citing Laker Airways, 731 F.2d at 927); see also China Trade, 837 F.2d at 35-36 (holding an antisuit injunction "effectively restricts the jurisdiction of the court of a foreign sovereign," thus, such orders "should be used sparingly, and should be granted only with care and great restraint" (internal quotation marks and citations omitted)).

In contrast, the Fifth and Ninth Circuits follow the "liberal approach," which places only modest emphasis on international comity and approves the issuance of an antisuit injunction when necessary to prevent duplicative and vexatious foreign litigation and to avoid inconsistent judgments. See Kaepa, Inc., 76 F.3d at 627-28 (concluding a district court does not abuse its discretion by issuing an antisuit injunction when litigation of the same action in a foreign forum "would result in inequitable hardship and tend to frustrate and delay the speedy and efficient determination of the cause" (internal quotations omitted)); see also E. & J. Gallo Winery v. Andina Licores S.A., 446 F.3d 984, 989-91 (9th Cir. 2006) (applying the Fifth Circuit's standard for issuance of an antisuit injunction (citing Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 335 F.3d 357, 364 n.19, 366-67 (5th Cir. 2003))). The Seventh Circuit similarly has indicated its agreement with the liberal approach. See Allendale Mut. Ins. Co. v. Bull Data Sys., Inc., 10 F.3d 425, 430-31 (7th Cir. 1993).

Under either the conservative or liberal approach, "[w]hen a preliminary injunction takes the form of a foreign antisuit injunction, [courts] are required to balance domestic judicial interests against concerns of international comity." Karaha Bodas Co., 335 F.3d at 366. We agree with the observations of the First Circuit that the conservative approach (1) "recognizes the rebuttable presumption against issuing international antisuit injunctions," (2) "is more respectful of principles of international comity," (3) "compels an inquiring court to balance competing policy considerations," and (4) acknowledges that "'issuing an international antisuit injunction is a step that

should 'be taken only with care and great restraint' and with the recognition that international comity is a fundamental principle deserving of substantial deference." Quaak, 361 F.3d at 18 (quoting Canadian Filters (Harwich) Ltd. v. Lear-Siegler, Inc., 412 F.2d 577, 578 (1st Cir. 1969)).  Likewise, we agree with the Sixth Circuit's observation the liberal approach "conveys the message, intended or not, that the issuing court has so little confidence in the foreign court's ability to adjudicate a given dispute fairly and efficiently that it is unwilling even to allow the possibility."  Gau Shan Co., 956 F.2d at 1355.

Although comity eludes a precise definition, its importance in our globalized economy cannot be overstated.  Compare Hilton v. Guyot, 159 U.S. 113, 164 (1895) (defining comity as "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation"), with Turner Entm't Co. v. Degeto Film GmbH, 25 F.3d 1512, 1519 n.10 (11th Cir. 1994) (noting commentators have defined comity using terms such as, "courtesy, politeness, convenience or goodwill between sovereigns, a moral necessity, expediency, reciprocity or consideration of high international politics concerned with maintaining amicable and workable relationships between nations" (internal quotation marks omitted)).  Indeed, the "world economic interdependence has highlighted the importance of comity, as international commerce depends to a large extent on 'the ability of merchants to predict the likely consequences of their conduct in overseas markets.'"  See Quaak, 361 F.3d at 19 (quoting Gau Shan Co., 956 F.2d at 1355)).  We also note, the Congress and the President possess greater experience with, knowledge of, and expertise in international trade and economics than does the Judiciary.  The two other branches, not the Judiciary, bear the constitutional duties related to foreign affairs. For these reasons, we join the majority of our sister circuits and adopt the conservative approach in determining whether a foreign antisuit injunction should issue.

**B.      Application of the Standard**

**1.      District Court's Decision**

In the absence of guidance from our circuit or the Supreme Court regarding the standard for issuing an antisuit injunction, the district court noted the split of authority and concluded under either the conservative or the liberal approach, "it is settled that considerations of comity have diminished force when, as here, one court has already reached judgment." Goss P.I., 435 F. Supp. 2d at 928 (citing Paramedics Electromedicina Comercial, Ltda. v. G.E. Med. Sys. Info. Techs., Inc., 369 F.3d 645, 655 (2d Cir. 2004)). In reaching this conclusion, the district court relied on the seminal case of Laker Airways Ltd. v. Sabena, Belgian World Airlines, wherein the Court of Appeals for the District of Columbia Circuit made an exhaustive inquiry into the propriety of issuing a foreign antisuit injunction. See Laker Airways, 731 F.2d at 909-59.[4]

As an initial matter, the district court noted the parties agreed the district court had equitable power to issue a foreign antisuit injunction to enjoin a party before it from pursuing litigation in a foreign forum, and "the All Writs Act, 18 U.S.C. § 1651, empowers the court to issue an injunction barring TKS from filing suit under the Japanese Special Measures Law." Goss P.I., 435 F. Supp. 2d at 924-25.

The district court next determined TKS's proposed invocation of the Special Measures Law was "a direct attack on [the] court's judgment in favor of Goss and a

---

[4]While applying our circuit's traditional four-factor preliminary injunction analysis under Dataphase Systems, Inc. v. C L Systems, Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc), the district court recognized the awkward fit of such an analysis in cases involving foreign antisuit injunctions. See Goss P.I., 435 F. Supp. 2d at 926 n.7. We agree. The analysis for issuing a foreign antisuit injunction primarily should focus on (1) whether an action in the foreign jurisdiction prevents United States jurisdiction or threatens a vital United States policy, and (2) whether the domestic interests outweigh concerns of international comity. We focus our review, therefore, upon the district court's analysis of these particular factors.

frontal assault on the jurisdiction of [the] court and the federal judiciary as a whole," an assault instituted "'for the sole purpose of terminating' [the] court's judgment in Goss's favor." Id. at 929 (quoting Gau Shan Co., 956 F.2d at 1356 (quoting Laker Airways, 731 F.2d at 915)). The district court reasoned TKS's proposed litigation was "clearly vexatious and oppressive" because TKS effectively sought to terminate the district court's judgment in favor of Goss, and "thereby in a single filing attempting to undo six years of federal court litigation." Id. The district court acknowledged that the issuance of an antisuit injunction "would be deeply offensive to the Japanese government" and "may have international repercussions," but nonetheless determined "its interest in protecting the integrity of its judgments and jurisdiction outweighs concerns over international comity." Id. The district court concluded:

> The fact that the legislative and executive branches were aware of this court's judgment and deliberately chose *not* to undo it through a retroactive repeal of the 1916 Act must inform the weight this court must give to international comity in this case. It is not the province of this court or the federal judiciary in general to rewrite the foreign policy of the United States government, as expressed by the legislative and executive branches of government.

Id. at 930.

Thus, the district court found the factors weighed in Goss's favor and issued a preliminary injunction. Id. at 931. In doing so, the district court stressed the order enjoined only TKS, not the Japanese government or judiciary, from availing itself of the Special Measures Law until the district court determined the merits of Goss's permanent injunction motion.

On appeal, TKS argues, because the judgment has been paid, a Japanese suit under the Special Measures Law would not threaten the jurisdiction of the United States. TKS further argues the United States would be deeply offended if a foreign

court granted an antisuit injunction under similar circumstances. TKS concedes a United States court may properly enjoin a party from seeking an order in a foreign court that would deprive the United States court of jurisdiction over a claim properly before it, but a United States court may not prevent a foreign national from taking recourse to its own courts for relief under a foreign statute that does not interfere with the jurisdiction of the United States courts. TKS further contends, under the district court's rationale, all actions under foreign clawback statutes are subject to injunction because all foreign clawback statutes would deprive United States courts of jurisdiction. Finally, TKS claims no vital American policy is being protected by the antisuit injunction.

### 2. Standard of Review

Our standard of review over the issuance of a preliminary injunction is a familiar one. "We review the District Court's material factual findings for clear error, its legal conclusions de novo, and the court's equitable judgment–the ultimate decision to grant the injunction–for an abuse of discretion." Heartland Acad. Cmty. Church v. Waddle, 335 F.3d 684, 689-90 (8th Cir. 2003).

> An abuse of discretion occurs when a relevant factor that should have been given significant weight is not considered, when an irrelevant or improper factor is considered and given significant weight, or when all proper and no improper factors are considered, but the court in weighing those factors commits a clear error of judgment.

Baker Elec. Coop., Inc. v. Chaske, 28 F.3d 1466, 1472 (8th Cir. 1994) (quotation omitted).

### 3. Goss's Antisuit Injunction

At the outset of our review, we acknowledge the district court's unenviable task to navigate the uncharted waters of foreign antisuit injunctions. We begin our review with a discussion of the instructive Laker Airways case relied upon by the district court. Laker Airways (Laker) brought an antitrust action against four foreign airlines

-12-

and four domestic corporations in the United States District Court for the District of Columbia. Laker Airways, 731 F.2d at 917. Shortly after Laker filed the lawsuit, the foreign defendants filed an action in the United Kingdom's High Court of Justice, requesting a declaration of non-liability and an injunction to prevent Laker from pursuing remedies in the United States courts under United States antitrust laws. Id. at 918. The requested relief stemmed from the alleged incompatibility between United States antitrust laws with their consequent treble damages on the one hand, and the Bermuda II Treaty and the British Protection of Trading Interests Act on the other. Id. The United Kingdom's High Court of Justice granted the injunction, which effectively terminated Laker's pending United States litigation as to the four foreign defendants. Id. In the district court, Laker successfully enjoined the remaining domestic defendants and two foreign airline defendants in a second antitrust action from filing any action in a foreign court that "would interfere with the district court's jurisdiction over the matters alleged in the complaint." Id. at 918-19.

On appeal, the Laker Airways defendants argued "the injunction was unnecessary to protect the district court's jurisdiction and violate[d] their right to take part in the 'parallel' actions commenced in the English courts." Id. at 921. A divided panel affirmed the decision, concluding an injunction by the United Kingdom's High Court of Justice would have stripped the United States court of control over Laker's pending litigation. Id. at 955-56. The court did not reach this conclusion without much deliberation, first recognizing "the fundamental corollary to concurrent jurisdiction must ordinarily be respected: parallel proceedings on the same in personam claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as res judicata in the other." Id. at 926-27. The court cautioned that while foreign antisuit injunctions only operate on the parties within the court's jurisdiction, "they effectively restrict the foreign court's ability to exercise its jurisdiction." Id. at 927.

In deciding the propriety of issuing an antisuit injunction, the <u>Laker Airways</u> court established factors to be considered, which included protecting United States jurisdiction, preserving important United States public policies, and balancing domestic interests with the principles of international comity. <u>Id.</u> at 926-45. The court recognized the futility of an interest balancing test in determining prescriptive jurisdiction because the "courts are forced to choose between a domestic law which is designed to protect domestic interests, and a foreign law which is calculated to thwart the implementation of the domestic law in order to protect foreign interests allegedly threatened by the objectives of the domestic law." <u>Id.</u> at 948. While acknowledging the domestic courts' obligation "to apply international law and foster comity," the court conceded that, when in doubt, "national interests will tend to be favored over foreign interests." <u>Id.</u> at 951. The court concluded, to protect properly the jurisdiction of the United States over the prescriptive jurisdiction of its United States antitrust laws, the district court acted within its discretion by enjoining the defendants from pursuing an injunction in the United Kingdom's High Court of Justice. <u>Id.</u> at 955-56. The court recognized, however, along with this act of preserving its own jurisdiction ran "the risk that counterinjunctions or other sanctions will eventually preclude Laker from achieving any remedy, if it is ultimately entitled to one under United States law. In either case the policies of both countries are likely to be frustrated at the cost of substantial prejudice to the litigants' rights." <u>Id.</u> at 953.

As in <u>Laker Airways</u>, most cases dealing with foreign antisuit injunctions involve simultaneous litigation in both United States and foreign courts. In <u>Gau Shan Co. v. Bankers Trust Co.</u>, for example, a borrower brought an action in a United States district court against its lender for fraud in connection with a loan note. <u>Gau Shan Co.</u>, 956 F.2d at 1352. When the lender tried to file an action in Hong Kong against the borrower for failure to pay the loan note, the United States court granted the borrower's motion for a foreign antisuit injunction. <u>Id.</u> The Sixth Circuit reversed, holding a parallel suit did not threaten United States jurisdiction and international comity precluded the issuance of an antisuit injunction. <u>Id.</u> at 1355-59. The court

reasoned, "The possibility that a holding of a Hong Kong court might permit [the lender] to gain control of [the borrower] is not a threat to the jurisdiction of the United States courts; rather, it is merely a threat to [the borrower]'s interest in prosecuting its lawsuit." Id. at 1356. Similarly, in China Trade & Dev. Corp. v. M.V. Choong Yong, the Second Circuit reversed the issuance of an antisuit injunction, concluding parallel litigation in the United States and Korea concerning a Korean corporation's liability did not frustrate an important United States policy or threaten the jurisdiction of the United States courts. China Trade, 837 F.2d at 34.

Other courts have upheld the issuance of a foreign antisuit injunction in the face of parallel litigation. For example, in Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren, when investors filed a securities fraud class action lawsuit in a United States district court against Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren (KPMG-B), KPMG-B was also a defendant in a contemporaneous criminal action in Belgium. Quaak, 361 F.3d at 14. The class action plaintiffs sought documents from KPMG-B, but KPMG-B claimed Belgian law prohibited KPMG-B from releasing the information. Id. at 14-15. Thereafter, KPMG-B instituted an action in the Belgian judicial system seeking to enjoin the class action plaintiffs from "taking any step" toward the discovery requests and to impose substantial penalties on parties pursuing discovery procedures. Id. The class action plaintiffs countered this move by filing a motion in the United States action and obtaining a foreign antisuit injunction against KPMG-B to prevent KPMG-B from pursuing the Belgian injunctive action. Id. On appeal, the First Circuit affirmed the injunction, agreeing with the district court that the character of the foreign action, the public policy of protecting investors against fraud, and the need to protect the court's jurisdiction all counterbalanced comity concerns under the peculiar circumstances of the case. Id. at 20.[5]

_____

[5]Foreign antisuit injunctions also have been dealt with in the context of compelling arbitration, see Paramedics Electromedicina, 369 F.3d at 648-49, and enforcing arbitration agreements, see Karaha Bodas Co., 335 F.3d at 359-60.

The case before us does not fit within the category of cases in which foreign antisuit injunctions have been considered. We do not believe the rationale of those cases compels an injunction in the present case.

First, although the All Writs Act, 28 U.S.C. § 1651(a), authorizes federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law," the Act does not create an independent source of federal jurisdiction. Syngenta Crop Prot., Inc. v. Henson, 537 U.S. 28, 31 (2002) (quoting 28 U.S.C. § 1651(a) and declaring the All Writs Act does not establish the original jurisdiction to support removal jurisdiction); see Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 333-34 (2d Cir. 2006) (rejecting the district court's assertion that an injunction issued pursuant to the All Writs Act provided the court with subject matter jurisdiction concluding, "[t]o hold otherwise would make mincemeat of the limited grants of jurisdiction bestowed upon us"); Sprint Spectrum L.P. v. Mills, 283 F.3d 404, 413 (2d Cir. 2002) (noting the All Writs Act, while not conferring an independent basis of jurisdiction, "'provides a tool courts need in cases over which jurisdiction is conferred by some other source'" (quoting United States v. Tablie, 166 F.3d 505, 507 (2d Cir. 1999) (per curiam))); Phillips Beverage Co. v. Belvedere S.A., 204 F.3d 805, 806 (8th Cir. 2000) (concluding the district court had continuing jurisdiction, therefore the All Writs Act provided the district court the authority to prevent a party from making an end run around the district court's previous denial of interim relief by enjoining the party from seeking relief elsewhere); Westinghouse Elec. Corp. v. Newman & Holtzinger, P.C., 992 F.2d 932, 937 (9th Cir. 1993) (concluding the All Writs Act does not operate to confer jurisdiction upon the district court, rather the Act only aids jurisdiction the district court already possesses).[6] In this case, at the time the district court issued the

_____

[6]"Although not a base of jurisdiction, the All Writs Act has been held to give the federal courts the power to implement the orders they issue by compelling persons not parties to the action to act, or by ordering them not to act." 14A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3691

preliminary antisuit injunction, the district court clearly possessed jurisdiction over the case and parties pursuant to 28 U.S.C. § 1331, and TKS had not paid the monetary judgment. Thus, the district court retained ancillary enforcement jurisdiction *until* satisfaction of the judgment. See Peacock v. Thomas, 516 U.S. 349, 356-57 (1996) ("Without jurisdiction to enforce a judgment entered by a federal court, 'the judicial power would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitution.'" (quoting Riggs v. Johnson County, 73 U.S. 166, 187 (1867) ("[T]he jurisdiction of a court is not exhausted by the rendition of the judgment, but continues until that judgment shall be satisfied."))).

Now, however, the antidumping litigation has culminated: a verdict was entered for Goss, which we affirmed on appeal; TKS paid the judgment; and the district court lifted the stay of the supersedeas bond. Therefore, the judgment now is rendered, paid, and satisfied. No pending litigation, other than this appeal, remains in the United States courts. Thus, the request for injunctive relief is not for the prevention of interdictory jurisdiction by Japanese courts. Instead, the United States courts are being asked to prevent TKS from seeking a remedy available solely in Japan. Neither the All Writs Act nor the court's ancillary enforcement jurisdiction provides the district court with a separate source of jurisdiction to enjoin TKS under these circumstances. See Peacock, 516 U.S. at 358 ("In determining the reach of the federal courts' ancillary jurisdiction, we have cautioned against the exercise of jurisdiction over proceedings that are 'entirely new and original,' or where 'the relief [sought is] of a different kind or on a different principle' than that of the prior decree." (quoting Krippendorf v. Hyde, 110 U.S. 276, 285 (1884), and Dugas v. Am. Surety Co., 300 U.S. 414, 428 (1937), respectively)).

_____

(3d ed. 1998). See, e.g., Sprint Spectrum, 283 F.3d at 413-14 (concluding the district court had the authority under the All Writs Act to compel a third party, without whom there would have been no underlying case or controversy, to perform the third party's contractual obligations to prevent the frustration of the district court's orders previously issued in the underlying action).

-17-

Second, in cases involving parallel litigation in foreign countries, once one court reaches a final judgment, the role of comity for antisuit injunction purposes essentially is moot because there is no longer tension with the foreign country over *concurrent* jurisdiction. Instead, the doctrine of res judicata should apply as a defense to further litigation of the same issues. As the <u>Laker Airways</u> court explained, "Comity ordinarily requires that courts of a separate sovereign not interfere with concurrent proceedings based on the same transitory claim, at least until a judgment is reached in one action, allowing res judicata to be pled in defense." <u>Laker Airways</u>, 731 F.2d at 939.

The issues previously decided below in the district court are different from the issues sought to be litigated in the foreign jurisdiction. TKS now seeks to litigate in Japan a cause of action solely available in Japan and not previously litigated in the antidumping litigation. The issues are not the same simply because TKS's cause of action under the Special Measures Law rests on the imposition of an adverse judgment against TKS under the 1916 Act.

Third, we disagree with the district court's assertion that Congress's decision to repeal the 1916 Act prospectively, rather than retroactively, may play a role in the decision to grant a foreign antisuit injunction to protect the court's jurisdiction or an important United States policy. Nothing in the repeal of the 1916 Act, nor any principle of law (aside from the doctrines of res judicata and collateral estoppel, which are inapplicable here), confers jurisdiction upon the court to maintain authority over the parties now that judgment has been satisfied. <u>Cf.</u> <u>Canady v. Allstate Ins. Co.</u>, 282 F.3d 1005, 1013 (8th Cir. 2002) (applying the relitigation exception of the All Writs Act, which protects from future litigation, a claim or issue that relates back to a prior federal court decision). Indeed, in repealing the 1916 Act, the Committee on the Judiciary (Committee) was clearly acting in response to the WTO proceedings and the potential for retaliation against the United States for not repealing the 1916 Act. <u>See</u> H.R. Rep. No. 108-415, at 5 (2004). The Committee knew the European Union (EU)

approved a regulation banning "the recognition and application of decisions taken under the 1916 Act within EU countries," and "allow[ing] EU-based companies and citizens to claim damages (with interest) for any penalties associated with [the 1916 Act's] application." Id. The dissenting members of the Committee also knew the EU's "blocking" regulation provided "EC companies with a right to recover any costs incurred in 1916 Act litigation." Id. at 18.

The district court also placed too much emphasis on the impact of the Special Measures Law on United States public policy. The Special Measures Law has a one-time application: There is no pending litigation under the now-defunct 1916 Act; Goss received the only judgment ever granted under the Act; thus, the only lawsuit possible under the Special Measures Law can be brought against Goss alone. Our consideration of international comity must allow the Japanese courts, in the first instance, to determine the enforceability of the Special Measures Law, which will undoubtedly involve application of Japanese precedent and domestic policy, and the Japanese courts' own consideration of international comity. If the Japanese judiciary upholds the enforceability of the Special Measures Law, it must next determine whether jurisdiction over Goss exists to maintain the lawsuit. International comity requires us to give deference to the Japanese courts to interpret Japanese laws. Goss is not precluded from seeking affirmative defenses under Japanese law in defending itself from the countermeasure. Furthermore, the United States representative to the WTO may seek to enforce provisions of the WTO Agreement to prevent TKS from enforcing the Special Measures Law as a suspension of obligations.[7]

We are profoundly aware a judgment in favor of TKS under the Special Measures Law would effectively nullify the remedy Goss legitimately procured in the

---

[7]We have not been apprised whether the DSB found Japan's Special Measures Law consistent with the WTO's suspension of concessions to the United States or whether the Special Measures Law otherwise has been challenged before the WTO. See supra n.3.

United States courts. Although such a result understandably is objectionable to Goss, it does not threaten United States jurisdiction or any current United States policy. Cf. Gau Shan Co., 956 F.2d at 1356 (concluding the possibility a foreign court's holding might threaten the United States plaintiff's interest in prosecuting its lawsuit is not a threat to the jurisdiction of the United States courts); Sea Containers Ltd. v. Stena AB, 890 F.2d 1205, 1213-14 (D.C. Cir. 1989) (holding no basis for an antisuit injunction existed because the issues litigated in the foreign court were different despite the fact that successful litigation in the foreign court would effectively overturn a decision of the United States court).

As in Laker Airways, the matter before us did not begin as an international jurisdictional standoff.[8] Rather, it arose out of the legislative policies of the United States and Japan, which resulted in "a head-on collision between the diametrically opposed antitrust policies of the United States and [Japan]." Laker Airways, 731 F.2d at 916, 948. Unlike Laker Airways, however, the present case involves no pending litigation between the parties (other than the present appeal) in the United States courts. Consequently, regardless of our approval or disapproval of clawback litigation in a particular foreign court, given the present posture of this case, it is beyond our limited jurisdiction and contrary to principles of comity to prevent TKS from seeking an action under the Special Measures Law in Japan. See Neighborhood Transp.

---

[8]The Laker Airways court discussed the tension between the antitrust laws of the United States and the United Kingdom, and the potential ramifications under the Protection of Trading Interests Act, 1980, c.11, § 5 (U.K.), a British clawback statute, which provides protection from multiple damage awards imposed under the laws of countries outside the United Kingdom. See Laker Airways, 731 F.2d at 943; see also Laker Airways Ltd. v. Pan Am. World Airways, 559 F. Supp. 1124, 1137 (D.D.C. 1983) ("The Protection of Trading Interests Act of 1980 directs British courts not to enforce treble damage awards against British firms, and . . . [its] 'clawback' provision allows non-United States firms doing business in the United Kingdom to sue there to recover two-thirds of treble damage awards levied against them in the United States.").

Network, Inc. v. Pena, 42 F.3d 1169, 1172 (8th Cir. 1994) (noting federal courts "can only hear actual 'cases or controversies' as defined by Article III of the Constitution," and "[w]hen a case on appeal no longer presents an actual, ongoing case or controversy, the case is moot and the federal court no longer has jurisdiction to hear it" (citing Preiser v. Newkirk, 422 U.S. 395, 401 (1975))).

Although the Special Measures Law, like other clawback or blocking provisions, can be regarded as an affront to the laws and judicial rules of the United States, see, e.g., Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct., 482 U.S. 522, 542-44 & n.29 (1987) (discussing France's blocking statute aimed at frustrating the disfavored United States antitrust discovery rules, and concluding the Hague Convention did not deprive the district court of jurisdiction it otherwise possessed to order a foreign national to produce evidence physically located within a foreign signatory nation), the United States Executive and Legislative Branches, not the Judiciary, are the governmental bodies to address those diplomatic tensions, see, e.g., Dames & Moore v. Regan, 453 U.S. 654, 686-87 (1981) (concluding, under the specific facts of the case, the district court properly denied injunctive relief because the President acted within his executive powers in nullifying claims pending in the United States court against Iranian assets); Karaha Bodas Co., 335 F.3d at 373 (concluding the district court acted in contravention of a treaty–the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 330 U.N.T.S. 38, codified at 9 U.S.C. § 201–by enjoining a party from seeking an action to annul an arbitration award).

The propriety of the Special Measures Law, and TKS's action thereunder, are matters for the Japanese courts in the first instance. Any response by the United States, such as a blocking statute for protection against a judgment awarded under the Special Measures Law or trade sanctions against Japan, must come through authorized representatives of the United States Executive or Legislative Branches, not the Judiciary. As the Laker Airways court observed,

The resources of the Judiciary are inherently limited when faced with an affirmative decision by the political branches of the government to prescribe specific policies. Absent an explicit directive from Congress, this court has neither the authority nor the institutional resources to weigh the policy and political factors that must be evaluated when resolving competing claims of jurisdiction. In contrast, diplomatic and executive channels are, by definition, designed to exchange, negotiate, and reconcile the problems which accompany the realization of national interests within the sphere of international association. These forums should and, we hope, will be utilized to avoid or resolve conflicts caused by contradictory assertions of concurrent prescriptive jurisdiction.

Laker Airways, 731 F.2d at 955.

The district court's obvious purpose in issuing the antisuit injunction was to constrain TKS from undermining six years of litigation by seeking recovery under the newly promulgated Japanese Special Measures Law. At the time the district court issued the injunction, TKS had not paid its judgment and the district court had not lifted the stay on TKS's performance bond. Given the status of the case at the time the injunction issued, the district court maintained ancillary enforcement jurisdiction to preserve the judgment and pursue collection. Thus, we need not decide whether the district court abused its discretion in issuing the preliminary antisuit injunction at that juncture. However, the jurisdictional circumstances and comity considerations have changed because there is no longer an outstanding judgment to protect. Given the criteria for granting a foreign antisuit injunction set forth and discussed herein, we conclude, under the facts of this case, the maintenance of the antisuit injunction on a satisfied judgment cannot be justified.[9]

---

[9]We recognize there are cases where the satisfaction of judgment is not, as here, solely the payment of a money judgment. Therefore, we reach no categorical conclusion regarding the propriety of the issuance of an antisuit injunction in all cases involving the preservation of a judgment.

-22-

## III. CONCLUSION

We vacate the district court's grant of a preliminary antisuit injunction and remand for dismissal of Goss's motion for injunctive relief.

———————————————————