IN THE UNITED STATES DISTRICT COURT FOR 
 THE MIDDLE DISTRICT OF ALABAMA 
 NORTHERN DIVISION 

MARLA R. SMITH, ) 
by and through her next friend, ) 
Jasmine Rachelle Smith, et al., ) 
 ) 
 Plaintiff, ) 
 ) 
 v. ) CIVIL CASE NO.: 2:20-cv-237-ECM 
 ) (WO) 
KAY IVEY, ) 
Governor of the State of Alabama, ) 
in her official capacity, et al., ) 
 ) 
 Defendants. ) 

 MEMORANDUM OPINION and ORDER 

 I. INTRODUCTION 
 Marla Renea Smith, by and through her next friend and sister, Jasmine Rachelle 
Smith, (hereinafter “Plaintiff”) brings this suit against the following Defendants in their 
official capacities: Alabama Governor Kay Ivey (“Governor Ivey”), Director of Emergency 
Management for the Emergency Management Agency of Alabama Brian Hastings 
(“Hastings”), and State Health Officer at the Alabama Department of Public Health 
(“ADPH”) Scott Harris (“Harris”) (collectively “Defendants”). Smith alleges that the 
Defendants are in violation of the Americans with Disabilities Act (“ADA”) and Section 
504 of the Rehabilitation Act of 1973 because of discriminatory language found in the 
ADPH’s Annex to the Emergency Support Function (“ESF”) 8 (“the Annex”) included 
within the State Emergency Operating Plan (“EOP”). She also asserts that she brings her 
claims under 42 U.S.C. § 1983.1 The Plaintiff requests that the Court issue a declaratory 
judgment finding that the Annex is null and void and in violation of the ADA and the 

Rehabilitation Act, enjoin the enforcement of the plan insofar as it prevents individuals 
with mental disabilities from having equal access to ventilators, retain jurisdiction of the 
case, and grant the Plaintiff equitable relief. 
 Pending before the Court are multiple motions: the Plaintiff’s motion for 
preliminary injunction filed on May 6, 2020 (doc. 8); Defendant Harris’s motion to dismiss 
for lack of jurisdiction filed on May 11, 2020 (doc. 9); Defendants Hastings and Governor 

Ivey’s motion to dismiss for failure to state a claim filed on May 11, 2020 (doc. 11); the 
Plaintiff’s motion to strike filed on June 15, 2020 (doc. 19); and the Plaintiff’s motion for 
summary judgment filed on June 22, 2020 (doc. 21). Furthermore, the Defendants request 
that their motion to dismiss under 12(b)(6) be treated as a summary judgment motion under 
Fed. R. Civ. P. 56, based on the Plaintiff’s presentation of matters outside the complaint. 

Fed. R. Civ. P. 12(d). On July 30, 2020, the Court heard oral argument on the pending 
motions, and they are ripe for consideration.2 

1 The Plaintiff has sued the Defendants under 42 U.S.C. § 1983, but she does not assert any constitutional 
claims. (Doc. 1). No substantive rights are created by § 1983; it merely provides a remedy for deprivations 
of federal rights created elsewhere. Wideman v. Shallowford Cmty. Hosp., Inc., 826 F.2d 1030 (11th Cir. 
1987). To be successful on a § 1983 claim, a plaintiff must establish that (1) hse suffered a deprivation of 
rights, privileges, or immunities secured by the Constitution and the laws of the United States, and (2) the 
act or omission causing the deprivation was committed by a person acting under color of state law. Id. 
However, the Plaintiff does not have to bring claims under § 1983 to assert a cause of action under the ADA 
or the Rehabilitation Act. While the Plaintiff asserts in her brief that it should be apparent that she asserted 
an equal protection claim, the complaint is devoid of reference to either the Fourteenth Amendment or the 
Equal Protection Clause. (Doc. 1). 

2 The Plaintiff also moves to strike the affidavit of Eric Jones. (Doc. 19). The Court declines to strike the 
affidavit and will give it the weight it is due. In any event, the affidavit does not alter the findings in this 
opinion. 
 After careful review of the briefs filed in support of and in opposition to each 
motion, the supporting and opposing evidentiary materials, the supplementary briefing on 

the issue of standing, arguments of counsel, and the applicable law, the Court concludes 
that the Plaintiff does not have standing because the Annex is no longer in effect. 
Therefore, the Court lacks jurisdiction, and the case is due to be dismissed without 
prejudice. See Stalley ex rel. U.S. v. Orlando Reg’l Healthcare Sys., Inc., 524 F.3d 1229, 
1232 (11th Cir. 2008) (noting that a dismissal for lack of standing should be entered 
without prejudice). 

 II. BACKGROUND 
 The facts of this case span several decades and delve into multiple State legislative 
and executive actions. Accordingly, the Court will attempt to outline the facts in a 
digestible format. 
A. The Plaintiff’s Background and Procedural History 

 Marla Renea Smith is a woman over the age of 21 with a severe intellectual 
disability. Her sister, Jasmine Rachelle Smith, provides help to her because Marla Smith 
cannot make decisions for herself without significant assistance from others. Jasmine 
Smith filed this suit on or about April 9, 20203 on behalf of her sister in response to the 
language found in the ventilator triaging Exclusion Criteria found in the Annex to ESF 8. 

The Plaintiff alleges that, due to the Annex, she is at risk of having a ventilator illegally 

3 There is some dispute over the date of filing. The court system shows that the complaint was filed on 
April 9, 2020 at 9:57 AM. (Doc. 1 at 1, 1-2 at 1, and 1-3 at 1). The Plaintiff asserts that the case was filed 
on April 8, 2020 at some time before 2:22 PM, but the filing was delayed. (Doc. 16-1). 
withheld from her based on her intellectual disability, in violation of the ADA and Section 
504 of the Rehabilitation Act of 1973. 

 Upon review of the cross motions in this case, the Court required the parties to file 
additional briefs on standing. The parties addressed the issue of standing and all pending 
motions at the hearing on July 30, 2020. 
B. The Creation of the Annex to ESF 8 

 1. Development of the State EOP Pursuant to the EMA 

 The Alabama Emergency Management Act of 1955 (“EMA”) established the 
Alabama Emergency Management Agency to protect the public peace, health, and safety 
in the event of a State-wide emergency. Ala. Code §§ 31-9-2 & 31-9-4 (1975). The 
Director of Emergency Management is the executive head of the agency and 
“coordinate[s] the activities of all organizations of emergency management within the 
state.” Ala. Code § 31-9-4(d). The Governor is also authorized: 
 [t]o prepare a comprehensive plan and program for the 
 emergency management of this state, such plan and program to 
 be integrated and coordinated with the emergency management 
 plans of the federal government and of other states to the fullest 
 possible extent, and to coordinate the preparation of plans and 
 programs for emergency management by the political 
 subdivisions of this state, such plans to be integrated into and 
 coordinated with the emergency management plans and 
 programs of this state to the fullest possible extent. 

Ala. Code § 31-9-6. “All orders, rules, and regulations promulgated by the Governor as 
authorized by this article shall have the full force and effect of law when a copy thereof is 
filed in the office of the Secretary of State.” Ala. Code § 31-9-13. 
 On February 15, 1994, then Governor Jim Folsom issued Executive Order No. 15 
pursuant to the EMA, Ala. Code § 31-9-1, et seq., to empower the Alabama Emergency 

Management Agency to prepare for emergency responses. (Doc. 23-1). The Executive 
Order required the development of the State EOP, which “shall be followed in conducting 
emergency activities.” (Id. at 2). The Executive Order also requires the development of 
agency policies in conjunction with the EOP. The order stipulates: 
 IT IS FURTHER ORDERED, that each department or agency 
 assigned a primary responsibility shall prepare a functional 
 annex, an implementation strategy that sets forth policies and 
 provisions for carrying out the various emergency services it 
 will undertake and will coordinate with the AEMA to properly 
 interface with all providers of emergency assistance. 

(Id. at 3). Accordingly, the agencies affected by the Executive Order set about developing 
their own annexes to the EOP. 
 The most recent iteration of the State EOP was prepared in March 2017. (Doc. 17-
1). The plan provides, “[t]his plan, including updates, remains in effect from the time of 
adoption until modified by changes in policy, planning guidance, or executive order.” (Id. 
at 4). The plan is “developed, promulgated, and maintained under State and Federal 
statutes and regulations,” including the Alabama EMA, six executive orders, and the 
Alabama Anti-Terrorism Act of 2002. (Id. at 5). Those State agencies which are expected 
to be involved with emergencies are assigned various ESFs. The agencies with “primary 
support responsibilities will be responsible for implementing and maintaining respective 
Emergency Support Annexes.” (Id. at 36). One of these ESFs is “ESF #8 – Public Health 
and Medical Services.” The agency primarily responsible for ESF 8 is the ADPH. (Id.). 
 2. Annex to ESF 8 

 Attached to the 2017 EOP is the ADPH’s Annex to ESF 8, or “Criteria for 
Mechanical Ventilator Triage Following Proclamation of Mass-Casualty Respiratory 
Emergency.” The Defendants represent that the Annex was developed in 2010 by the 
ADPH in response to fears of a future pandemic. (Doc. 9 at 9). They state that the Annex 
was created “with input from multiple medical, legal, religious, academic, and ethics 
professionals, consistent with then-current best practices during a pandemic.” (Id.). The 
Annex “outlines a ventilator triage protocol intended for use only during a mass casualty 

event, proclaimed as a public health emergency by the Governor.” (Doc. 8-1 at 2). Its 
purpose is to be “[o]ffered as a template for inclusion in hospital disaster plan/policy 
following declaration of statewide, regional, or national public health respiratory 
emergency.” (Id.). Thus, because it is a template, it is not mandatory, but “[i]t is highly 
recommended” that stakeholders endorse the document. (Id. at 2–3). 

 The Annex further creates three tiers of triaging guidelines for hospitals to follow, 
depending on triggering events within the State. (Id. at 3). For example, for Tier 1, a 
“[p]roclamation of a state of public health emergency by the Governor is a necessary initial 
trigger. All hospitals will implement Tier 1 upon the Governor’s proclamation.” (Id. at 4). 
But Tiers 2 and 3 provide that they are hospital-specific choices, depending on the unique 

situation each hospital faces. The Annex also provides a flow chart of steps hospitals 
should take when the Governor issues a proclamation of a state of public health emergency. 
(Id. at 6). The first step cancels all elective surgeries that may require post-operation 
ventilators. (Id.). The second alerts staff to the Annex criteria for all incoming Emergency 
Department patients. (Id.). Central to this case, the third step requires hospital staff to 
evaluate all patients with a respiratory illness based on the Exclusion Criteria outlined in 

Appendix 1. (Id.). Should an eventual ventilator shortage arise, then Tiers 2 and 3 could 
be triggered, leading to removal of patients from ventilators if they meet certain Exclusion 
Criteria. (Id.). 
 The Exclusion Criteria in Appendix 1 include numerous medical conditions, such 
as cardiac arrest, severe trauma, dementia, metastatic malignancy, severe burn, and end 
stage organ failure. (Id. at 7). Neurological diagnoses are listed as one form of end stage 

organ failure. (Id.). Appendix 2 provides a detailed explanation of what qualifies as a 
neurological condition for purposes of the Exclusion Criteria. (Id. at 9). The description 
reads, “persons with severe mental retardation, advanced dementia or severe traumatic 
brain injury may be poor candidates for ventilator support. . . . Persons with severe or 
profound mental retardation, moderate to severe dementia, or catastrophic neurological 

complications such as persistent vegetative state are unlikely candidates for ventilator 
support.” (Id.). 
 In 2017, the State formed a new Crisis Standards of Care (“CSC”) Working Group.4 
(Doc. 9 at 9). This group reviewed old guidelines, including the Annex to ESF 8. (Id.). 
New CSC Guidelines—which still included the Annex to ESF 8—were submitted for 

review to a subject matter expert in 2019, who determined that the Exclusion Criteria in 
the ventilator triaging guidelines were not accepted or appropriate. (Id. at 10). The State 

4 Whether the CSC Guidelines were developed appropriately is not an issue currently before the Court. 
then removed the Annex from the CSC Guidelines on February 28, 2020. (Id.). The Annex, 
however, remained on some State websites. (Id.). 

C. Declaration of State of Emergency in Alabama due to COVID-19 

 On March 13, 2020, Governor Ivey declared a State of Emergency pursuant to the 
EMA, Ala. Code § 31-9-8, in response to the rapidly spreading novel COVID-19 
(“coronavirus”), which the World Health Organization declared a worldwide pandemic in 
March 2020. Governor Ivey issued the March 13 Proclamation in response to the 
appearance of the virus in Alabama and directed the appropriate State agencies to respond 
to the public health emergency. Governor Ivey concluded, “I declare that this proclamation 
and all subsequent orders, laws, rules, or regulations issued pursuant hereto shall remain in 
full force and effect for the duration of the public health emergency unless rescinded or 
extended by proclamation.” (Doc. 25-1 at 3). 
 Since the initial Proclamation, Governor Ivey has adopted at least one agency rule 

as a proclamation filed with the Secretary of State. In that instance, she recognized that 
the State Health Officer had promulgated an emergency rule called the “Order of the State 
Health Officer Suspending Certain Public Health Gatherings Due to Risk of Infection by 
COVID-19.” (Doc. 29-1 at 3). The emergency rule was adopted by the State Health Officer 
pursuant to the Alabama Administrative Procedure Act (“AAPA”) and was “effective for 

a period of not longer than 120 days and shall not be renewable.” Ala. Code § 41-22-
5(b)(1). Because the emergency rule could not be re-adopted, Governor Ivey included the 
rule, or the “Safer at Home order,” as a part of her Proclamation, promulgating it “as an 
order, rule, or regulation under the applicable provisions of the Emergency Management 
Act.” (Doc. 29-1 at 3) (citing Ala. Code § 31-9-6(1) & 31-9-13). The Safer at Home order 
suspends certain public gatherings, requires a fourteen-day quarantine for any individual 

who receives a positive coronavirus test result, and outlines other requirements and 
recommendations to help slow the spread of the virus. (Id.). 
D. Resolution of Complaint Filed with the Office for Civil Rights at the United 
 States Department of Health and Human Services and the Removal of Annex 
 to ESF 8 

 The Office for Civil Rights (“OCR”) at the United States Department of Health and 
Human Services (“HHS”) has jurisdiction to enforce Title II of the ADA and Section 1557 
of the Patient Protection and Affordable Care Act. 42 U.S.C. § 2000d; 45 C.F.R. §§ 80.1–
80.13. HHS OCR’s compliance review process is exercised over complaints that fall 
within its jurisdiction. The agency explains, 
 [i]f the evidence indicates that the covered entity was not in 
 compliance with the applicable regulation or law, OCR will 
 attempt to resolve the case by obtaining corrective action 
 through a voluntary agreement with the covered entity. OCR 
 will notify the complainant and the covered entity of the result 
 of the investigation. 

 If the covered entity does not take voluntary action to resolve 
 the matter in a way that is satisfactory, OCR will issue a Letter 
 of Findings that describes how the covered entity is not in 
 compliance and identifies next steps, which may include 
 referral to the Department of Justice for enforcement action; 
 steps to terminate Federal financial assistance to the covered 
 entity; or other actions. 

Office for Civil Rights, How OCR Enforces Civil Rights Discrimination Laws and 
Regulations, U.S. DEP’T OF HEALTH AND HUMAN SERVS. (Sept. 29, 2015), 
https://www.hhs.gov/civil-rights/for-providers/compliance-enforcement/enforcement-
process/index.html (last visited Nov. 18, 2020). 

 Even though the Annex to ESF 8 was removed from the CSC Guidelines on 
February 28, 2020, it remained on some State websites. Thus, on March 24, 2020, the 
Alabama Disabilities Advocacy Program filed a complaint with the HHS OCR, arguing 
that the ADPH’s Annex to ESF 8 did not comply with Section 504 of the Rehabilitation 
Act of 1974, Title II of the ADA, or Section 1557 of the Affordable Care Act. (Doc. 9 at 
8). Beginning on April 4, 2020, the State of Alabama participated in compliance review 

with the HHS OCR. The Notice to the Department explains, “the complaint alleges that 
ADPH’s policy, Emergency Operations Plan: Criteria for Mechanical Ventilator Triage 
(2010 Ventilator Triage Guidelines) unlawfully singles out and authorizes the denial of 
treatment to individuals with disabilities.” (Doc. 9 at 8). 
 The HHS OCR closed its investigation on April 8, 2020 as “satisfactorily resolved 

without a finding of liability.” (Id. at 29). Under the HHS OCR agreement, Alabama 
agreed to: (1) remove all links to the 2010 Exclusion Criteria from websites; (2) comply 
with civil rights law; (3) clarify publicly that the 2010 criteria are not in effect; (4) not 
include similar provisions singling out individuals with disabilities for unfavorable 
treatment or use age cutoffs in future CSC guidelines; and (5) not interpret current 

guidelines in such a manner. (Id.). 
 Consequently, the State posted new guidelines on its website in April 2020.5 (Doc. 
16 at 5, n.8). The ADPH also modified its website on April 22, 2020 to read, 

 [t]he Ventilator Triage Guidance posted in 2010 is no longer in 
 effect. It has been replaced by the Alabama Crisis Standards of 
 Care Guidelines. The Alabama Crisis Standards of Care 
 Guidelines are the only crisis care guidelines endorsed by the 
 Alabama Department of Public Health. All people deserve 
 compassion and equal respect, and with this in mind, the 
 allocation of care cannot discriminate based on race, color, 
 national origin, disability, age, sex, exercise of conscience or 
 religion. 

(Doc. 9 at 43). Finally, on May 6, 2020, the State received a formal notice from the HHS 
OCR that its review was satisfactorily resolved. (Id. at 12). The Plaintiff disputes that these 
steps sufficiently revoked the Annex. 
 III. STANDARD OF REVIEW 
 Pending before the Court are a motion for preliminary injunction, motions to 
dismiss, and motions for summary judgment. Each type of motion requires the application 
of a different standard of review. 
A. Motion for Preliminary Injunction 
 The decision to grant or deny a preliminary injunction “is within the sound 
discretion of the district court.” Palmer v. Braun, 287 F.3d 1325, 1329 (11th Cir. 2002). 
To prevail on her motion for a preliminary injunction, the Plaintiff bears the burden of 
demonstrating: 

5 The exact date is either April 8, 2020 or April 18, 2020. The Plaintiff states, “[r]egarding publication of 
the Guidelines on the internet, we note that Defendant’s submissions appear to include a scrivenor’s error, 
insofar as they suggest the Guidelines were published on the internet on April 8, 2020. A thorough search 
of internet archives reveals no record of the web page in question (i.e., with the guidelines) before April 18, 
2020).” (Doc. 16 at 5, n.8). 
 (1) a substantial likelihood of success on the merits of the 
 underlying case, (2) the movant will suffer irreparable harm in 
 the absence of an injunction, (3) the harm suffered by the 
 movant in the absence of an injunction would exceed the harm 
 suffered by the opposing party if the injunction issued, and (4) 
 an injunction would not disserve the public interest. 

North Am. Med. Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1217 (11th Cir. 2008) 
(quoting Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 
1246–47 (11th Cir. 2002)); see also Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1097 
(11th Cir. 2004) (quoting Siegel v. Lepore, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) 
(per curiam)). “In this Circuit, [a] preliminary injunction is an extraordinary and drastic 
remedy not to be granted unless the movant clearly established the ‘burden of persuasion’ 
as to each of the four prerequisites.” Siegel, 234 F.3d at 1176. 
B. Motions to Dismiss 
 A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the complaint 
against the legal standard set forth in Rule 8: “a short and plain statement of the claim 
showing that the pleader is entitled to relief.” Fed. R. Civ. P. 8(a)(2). “To survive a motion 
to dismiss, a complaint must contain sufficient factual matter, accepted as true, to ‘state a 
claim to relief that is plausible on its face.’” Ashcroft v. Iqbal, 556 U. S. 662, 678 (2009) 
(quoting Bell Atl. Corp. v. Twombly, 550 U. S. 544, 570 (2007)). 
 However, a defendant may attack the plaintiff’s subject matter jurisdiction under 
Fed. R. Civ. P. 12(b)(1) through a facial attack or a factual attack. Lawrence v. Dunbar, 
919 F.2d 1525, 1528–29 (11th Cir. 1990) (per curiam). Facial attacks require the Court to 

determine whether “the plaintiff has sufficiently alleged a basis of subject matter 
jurisdiction, and the allegations in [her] complaint are taken as true for the purposes of the 
motion.” Id. (quoting Menchaca v. Chrysler Credit Corp., 613 F.2d 507, 511 (5th Cir. 
1980)).6 A factual attack challenges instead “the existence of subject matter jurisdiction in 

fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and 
affidavits, are considered.” Id. (quoting Menchaca, 613 F.2d at 507). 
 In this case, the Defendants bring a factual attack on the Plaintiff’s subject matter 
jurisdiction. See Stalley ex rel. U.S., 524 F.3d at 1232. Accordingly, the Court may 
consider facts outside the pleadings.7 See Kennedy v. Beachside Commercial Props., LLC, 

732 F. App’x 817, 822 (11th Cir. 2018) (noting that standing is a “fact-sensitive inquiry”). 
“On a factual attack of subject matter jurisdiction, a court's power to make findings of facts 
and to weigh the evidence depends on whether the factual attack on jurisdiction also 
implicates the merits of plaintiff's cause of action.” Garcia v. Copenhaver, Bell & Assocs., 
M.D.’s, P.A., 104 F.3d 1256, 1261 (11th Cir. 1997) (citing Lawrence, 919 F.2d at 1261). 

When the facts do not implicate the merits of the plaintiff’s cause of action, 
 the trial court may proceed as it never could under 12(b)(6) or 
 Fed.R.Civ.P. 56. Because at issue in a factual 12(b)(1) motion 
 is the trial court's jurisdiction—its very power to hear the 
 case—there is substantial authority that the trial court is free to 
 weigh the evidence and satisfy itself as to the existence of its 
 power to hear the case. In short, no presumptive truthfulness 
 attaches to plaintiff's allegations, and the existence of disputed 
 material facts will not preclude the trial court from evaluating 
 for itself the merits of jurisdictional claims. 

6 See Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), adopting as binding precedent 
all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. 

7 While the Court recognizes that Kennedy v. Beachside Commercial Properties, LLC is an unpublished 
opinion, the Court finds the principles stated in Kennedy persuasive. 
Lawrence, 919 F.2d at 1528–29 (quoting Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir. 
1981)). When the merits of a plaintiff’s cause of action are implicated, the proper course 

is for the court to convert the 12(b)(1) motion into a Rule 12(b)(6) motion. Whitson v. Staff 
Acquisition, Inc., 41 F.Supp.2d 1294, 1297 (M.D. Ala. 1999). 
 Thus, in order to determine whether the Plaintiff has standing, the Court must 
consider whether the Defendants’ factual attack goes to the merits of the Plaintiff’s case. 
See Garcia, 104 F.3d at 1261. “[S]ubject-matter jurisdiction is inextricably intertwined 
with the merits of the case” when “the defendant’s challenge to the court’s jurisdiction is 

also a challenge to the existence of a federal cause of action.” Estate of Kerrigan v. 
Kerrigan, 2019 WL 6560027, at *3 (M.D. Ala. Dec. 4, 2019) (internal quotations and 
citations omitted). Thus, jurisdiction is “inextricably intertwined” with the merits of a 
plaintiff’s claims when “a decision on one would effectively decide the other,” Lawrence, 
919 F.2d at 1529, and when “a statute provides the basis for both the subject matter 

jurisdiction of the federal court and the plaintiff’s substantive claim for relief.” Turcios v. 
Delicias Hispanas Corp., 275 F. App’x. 879, 888 (11th Cir. 2008) (quoting Morrison v. 
Amway Corp., 323 F.3d 920, 926 (11th Cir. 2003)). 
 Here, the Court has original subject matter jurisdiction over the Plaintiff’s 
discrimination claim pursuant to 28 U.S.C. § 1331. However, in determining jurisdiction 

and in reviewing the Plaintiff’s substantive claim for relief, the Court is not required to 
interpret the provisions of the Annex to ESF 8 itself and evaluate the Plaintiff’s claims 
under the ADA and Section 504 of the Rehabilitation Act of 1973. Consequently, the 
merits of the federal cause of action are not inextricably intertwined with the Defendants’ 
jurisdictional challenge. See Estate of Kerrigan, 2019 WL 6560027, at *5. The Court will 
review the Defendants’ Rule 12(b)(1) motion accordingly, with substantial authority to 

weigh the evidence. Lawrence, 919 F.2d at 1528–29. 
C. Motion for Summary Judgment 
 Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court shall 
grant a motion for “summary judgment if the movant shows that there is no genuine dispute 
as to any material fact and the movant is entitled to a judgment as a matter of law.” Fed. R. 
Civ. P. 56(a). The party seeking summary judgment “always bears the initial responsibility 

of informing the district court of the basis for its motion, and identifying those portions of 
‘the pleadings, depositions, answers to interrogatories, and admissions on file, together 
with the affidavits, if any,’ which it believes demonstrates the absence of a genuine issue 
of material fact.” Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. 
P. 56). The movant can meet this burden by presenting evidence demonstrating there is no 

dispute of material fact, or by showing that the non-moving party has failed to present 
evidence in support of some element of his case on which he bears the ultimate burden of 
proof. Id. at 322–23. Only disputes about material facts will preclude the granting of 
summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). “An issue 
of fact is ‘genuine’ if the record as a whole could lead a reasonable trier of fact to find for 

the nonmoving party. An issue is ‘material’ if it might affect the outcome of the case under 
the governing law.” Redwing Carriers, Inc. v. Saraland Apartments, 94 F.3d 1489, 1496 
(11th Cir. 1996) (citing Anderson, 477 U.S. at 248). 
 Once the movant has satisfied this burden, the non-moving party “must do more 
than simply show that there is some metaphysical doubt as to the material facts.” 

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Non-
movants must support their assertions “that a fact cannot be or is genuinely disputed” by 
“citing to particular parts of materials in the record, including depositions, documents, 
electronically stored information, affidavits or declarations, stipulations . . . , admissions, 
interrogatory answers, or other materials” or by “showing that the materials cited do not 
establish the absence or presence of a genuine dispute, or that an adverse party cannot 

produce admissible evidence to support the fact.” Fed. R. Civ. P. 56(c)(1)(A) & (B). 
 In reviewing whether the nonmoving party has met its burden, the court must stop 
short of weighing the evidence and making credibility determinations of the truth of the 
matter. Instead, the evidence of the nonmovant is to be believed, and all justifiable 
inferences are to be drawn in his favor.” Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 

998–99 (11th Cir. 1992). 
 IV. DISCUSSION 
 As an initial inquiry, the Court must satisfy itself that it has jurisdiction and must do 
so before reaching the merits. The Court will make that determination by weighing the 
evidence. For the Court to have jurisdiction, the Plaintiff must establish Article III 

standing. The Plaintiff’s standing to bring this suit rises and falls on whether the Annex to 
ESF 8 is still in effect. If the Annex is no longer in effect, then the Plaintiff is not at risk 
of future injury by having a ventilator discriminatorily withheld from her and therefore 
does not present an injury in fact. For the following reasons, the Court finds that the Annex 
is not in effect. Consequently, the Plaintiff does not have standing. 

A. Article III Standing 
 Article III, § 2 of the Constitution limits federal court jurisdiction to “Cases” or 
“Controversies.” U.S. CONST. art. III, § 2. “No principle is more fundamental to the 
judiciary’s proper role in our system of government than the constitutional limitation of 
federal-court jurisdiction to actual cases or controversies.” Raines v. Byrd, 521 U.S. 811, 
818 (1997) (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 37 (1976)). 

Accordingly, the Court must determine whether it has jurisdiction before it can proceed to 
the merits of the case. See Trichell v. Midland Credit Mgmt., Inc., 964 F.3d 990, 996 (11th 
Cir. 2020). To this end, the Court must first consider whether the Plaintiff has Article III 
standing. See id. 
 It is well settled that standing requires (1) an injury in fact, both “concrete and 

particularized” and “actual or imminent,” (2) “a causal connection between the injury and 
the conduct complained of,” and (3) likely redressability by the court. See Lujan v. Defs. 
of Wildlife, 504 U.S. 555, 560–61 (1992). A plaintiff bears the burden of establishing 
standing through these elements. Spokeo, Inc. v. Robins, 136 S.Ct. 1540, 1547 (2016). 
 “[T]he injury-in-fact requirement requires a plaintiff to allege an injury that is both 

‘concrete and particularized.’” Id. at 1545 (quoting Friends of the Earth v. Laidlaw Envtl. 
Servs., Inc., 528 U.S. 167, 180–81 (2000)) (emphasis in original). First, to be concrete, an 
injury must actually exist; it must be real and not abstract. Id. at 1548. “As a general matter, 
tangible injuries qualify as concrete,” although intangible harms can as well.8 Trichell, 964 
F.3d at 997. The threat of a future injury can be concrete enough to create standing. See, 

e.g., Remijas v. Neiman Marcus Grp., LLC, 794 F.3d 688, 692–96 (7th Cir. 2015) (finding 
that the risk of injury as a result of personal data theft was sufficient for standing purposes 
because there was an “objectively reasonable likelihood” that the injury would occur). 
Second, “[f]or an injury to be ‘particularized,’ it ‘must affect the plaintiff in a personal and 
individual way.’” Spokeo, 136 S.Ct. at 1548 (quoting Lujan, 504 U.S. at 560, n.1). 
 However, when considering future risk-as-injury, the Court must also consider 

whether the risk is “material,” Muransky v. Godiva Chocolatier, Inc., --- F.3d ----, 2020 
WL 6305084, at *7 (11th Cir. Oct. 28, 2020) (en banc), and whether the risk dissipated 
before filing suit. Trichell, 964 F.3d at 1000. “Article III demands that an ‘actual 
controversy’ persist throughout all stages of litigation.” Hollingsworth v. Perry, 570 U.S. 
693, 705 (2013) (citing Already, LLC v. Nike, 568 U.S. 85, 90–1 (2013)); see also 

Arizonans for Official English v. Arizona, 520 U.S. 43, 67 (1997) (“[A]n actual controversy 
must be extant at all stages of review, not merely at the time the complaint is filed.”) 
(quoting Preiser v. Newkirk, 422 U.S. 395, 401 (1975)). A plaintiff must have standing at 
the time of the filing, and a plaintiff still may lose standing over time if the actual 
controversy dissipates. Hollingsworth, 570 U.S. at 705. 

8 The Plaintiff suggests that her alleged risk of injury may be intangible because she seeks to vindicate her 
substantive right “to be free from discrimination prohibited by Federal law.” (Doc. 28 at 4). However, if 
she did have a ventilator withheld from her on the basis of her disability, the Plaintiff’s injury would be 
tangible. A tangible harm is one “[h]aving or possessing physical form; corporeal.” Tangible, BLACK’S 
LAW DICTIONARY (11th ed. 2019). Regardless, the Court concludes that she does not have standing because 
there is no longer a risk of this injury posed by the Annex to ESF 8. 
B. Standing Analysis 
 1. The Plaintiff does not allege an injury in fact. 

 The Plaintiff does not have standing because she cannot demonstrate an injury in 
fact. She alleges a risk of future injury: that she will have a ventilator withheld from her 
due to her disability because of the language contained in the Annex. The Court finds that 
this possibility no longer exists. 
 When considering risk-as-injury, the Court must determine whether the risk actually 
exists or whether the risk posed to the Plaintiff dissipated. Trichell, 964 F.3d at 1000. The 

Plaintiff must demonstrate that the “material risk of harm” posed is “important; essential; 
relevant.” Muransky, 2020 WL 6305084, at *7. “Whatever ‘material’ may mean, 
conceivable and trifling are not on the list.” Id. For example, in Trichell, the plaintiffs sued 
after they received collection letters in the mail, proposing new debt repayment plans for 
each plaintiff’s outstanding debt. 964 F.3d at 995. However, if the plaintiffs accepted the 

debt repayment plans, they would subject themselves to a new statute of limitations on 
recovery of their outstanding debt. Id. Accordingly, although they did not accept the offers 
in the letters, the plaintiffs alleged that the collection letters sent by the defendants could 
have misled them. Id. at 1002–03. The court determined that any risk to the plaintiffs 
dissipated before they filed their suit. Id. Neither plaintiff acted on the collection letters, 

and, by filing the suit, they could not allege that they were at risk of being misled in the 
future. Id. This lack of risk in the future meant that they did not allege an injury in fact. 
Id. “[I]t is the plaintiff's burden to establish standing by demonstrating that, if unchecked 
by the litigation, the defendant's allegedly wrongful behavior will likely occur or continue, 
and that the ‘threatened injury [is] certainly impending.’” Friends of the Earth, 528 U.S. at 
190 (quoting Whitmore v. Arkansas, 495 U.S. 149, 158 (1990)) (citations and internal 

quotation marks omitted). Accordingly, the Court now turns to whether Plaintiff’s alleged 
risk-as-injury actually exists. 
 a. The Annex to ESF 8 was a nonbinding, voluntary plan; it was not 
 a rule with the force of law under the AAPA, and it did not carry 
 the force of law under the EMA. 

 The Plaintiff argues that, because the Annex to ESF 8 is a rule under the AAPA, it 
must be revoked according to the AAPA’s rulemaking procedures. However, the Plaintiff 
failed to produce any evidence that the Annex was promulgated pursuant to the AAPA. 
The Plaintiff rather points to the definition of “rule” within the AAPA and argues that 
because the Annex could fit within the definition, it therefore is a rule. (Doc. 18 at 4). The 
statute defines a “rule” as, 
 [e]ach agency rule, regulation, standard, or statement of 
 general applicability that implements, interprets, or prescribes 
 law or policy, or that describes the organization, procedure, or 
 practice requirements of any agency and includes any form 
 which imposes any requirement or solicits any information not 
 specifically required by statute or by an existing rule or by 
 federal statute or by federal rule or regulation . . . . 

Ala. Code § 41-22-3(9). The Plaintiff argues that because the Annex fits the definition of 
a rule, it must be removed according to the rulemaking provisions of the AAPA, or else it 
is still in effect, and the Plaintiff is still at risk. (Doc. 8); see also Ala. Code § 41-22-5 
(outlining the requirements for adoption, amendment, or repeal of administrative rules). 
The Plaintiff also argues that the Annex must be revoked by Governor Ivey through 
proclamation because her March 13, 2020 proclamation declared, “this proclamation and 
all subsequent orders, laws, rules, or regulations issued pursuant hereto shall remain in full 
force and effect for the duration of the public health emergency unless rescinded or 
extended by proclamation.” (Doc. 25-1 at 3). 

 The Defendants respond that the Annex was never a rule and never carried the force 
of law; it was developed as a support plan to the EOP. (Doc. 15 at 5). The Defendants 
state, “[t]his plan is not, nor has it ever been, subject to the AAPA process.” (Id.). They 
argue that the Annex and the EOP are purposefully “flexible and adaptable” to deal with 
crises much like the coronavirus pandemic, and they were adopted according to the EMA 

and Executive Order No. 15. (Id.); (see also doc. 23 at 7–9). They further add that 
Governor Ivey does not need to issue a proclamation rescinding the Annex because she is 
not required to do so by the EMA, EOP, or Executive Order No. 15. (Doc. 23 at 9). 
 The Court finds that the Annex was a nonbinding plan without the force of law, 
attached to the State EOP and developed under the framework of Executive Order No. 15 

and the EMA.9 First, both the Defendants and the Plaintiff agree that there is no evidence 
that the Annex was promulgated pursuant to AAPA rulemaking requirements. The Annex 
was developed with input from experts—but without formal notice and comment. In 
Alabama, a rule typically establishes a binding norm, and “[a]lthough it is not 

9 Even if the Annex to ESF 8 should have been promulgated as a rule under the AAPA, the fact that it was 
not would render it an invalid rule. The AAPA provides that rules not promulgated according to the 
statute’s rulemaking requirements are invalid. See Ala. Code § 41-22-5(d) (“No rule adopted after October 
1, 1982, is valid unless adopted in substantial compliance with this section.”); Ala. Code § 41-22-10 (“In 
passing on such rules the court shall declare the rule invalid only if it finds that it violates constitutional 
provisions or exceeds the statutory authority of the agency or was adopted without substantial compliance 
with rulemaking procedures provided for in this chapter.”). Consequently, had the Annex been improperly 
promulgated, it would not have been enforceable by the State prior to its removal. 
determinative, an agency's characterization of its own standard as nonbinding is persuasive 
and deserves some weight.” Families Concerned About Nerve Gas Incineration v. Ala. 

Dep’t of Envtl. Mgmt., 826 So. 2d 857, 863, 870 (Ala. Civ. App. 2002). Thus, the Court 
looks to the text of the document itself to consider how the agency characterized the Annex. 
The Annex supplies that the ventilator triaging guidelines are nonbinding “template[s],” 
which are “highly recommended” for endorsement. (Doc. 8-1 at 2–3). This language does 
not connote a binding rule. Rather, the language suggests that the Annex is nonbinding 
and therefore not a rule with the force of law under the AAPA. 

 Second, the Annex was not promulgated as a law through the EMA. The EMA 
requires the Governor to file all orders, rules, and regulations in the office of the Secretary 
of State for them to have the force of law. Ala. Code § 31-9-13. Governor Ivey has done 
so each time she issued a proclamation in response to the coronavirus pandemic and when 
she adopted the Safer at Home emergency rule as part of her proclamation. (See doc 29-1). 

In contrast, the Annex was developed and attached to the EOP without proclamation. (Doc. 
23 at 7–9). Meanwhile, the EOP was not adopted by proclamation either and states that it 
is in effect unless “modified by changes in policy, planning guidance, or executive order.” 
(Doc. 17-1 at 4). The EOP provides internal mechanisms for adapting over time. (Id. at 
54). Accordingly, the Annex never carried the force of law through the EMA. 

 b. The Annex is no longer in effect, and thus the Plaintiff does not 
 have standing. 

 The Plaintiff fails to establish standing because the Court cannot find a concrete 
injury that is either actual or imminent—the State renounced the Annex before an injury 
could occur. See Lujan, 504 U.S. at 560–61. Accordingly, the Plaintiff’s risk-as-injury 
dissipated by the time the complaint was filed. See Trichell, 964 F.3d at 1000. The State 

agency removed the Annex from the CSC Guidelines on February 28, 2020. The Plaintiff 
filed suit on or about the same day that HHS’s OCR announced the resolution of its review 
of the Annex. As a result, the Annex was no longer offered as a template or guideline as 
of April 8, 2020.10 (Doc. 9 at 29). The ADPH was not required to follow rulemaking 
procedures to revoke the Annex; Governor Ivey was not required to revoke the Annex 
through proclamation. Like the plaintiffs in Trichell, the Plaintiff here is safe from the 

risk-of-injury alleged and never incurred an injury in fact. See 964 F.3d at 1002–03 (“The 
complaints thus did not, and could not, make any allegation that [the plaintiffs] [were] at 
risk of being misled in the future.”). Consequently, the Plaintiff does not have standing. 
 2. The Plaintiff also fails to establish causation and redressability. 

 Briefly, because the Plaintiff does not allege an injury in fact, she cannot establish 
a causal connection between any injury and the conduct of which she complains. See Lujan, 
504 U.S. at 560; see also Trichell, 964 F.3d at 998 (noting that the plaintiffs failed to 
demonstrate damages, let alone that relying on the defendants’ actions caused damages). 
Moreover, even if the Plaintiff did allege an injury in fact and causation, she would not 
have standing for want of redressability. “[I]t must be likely, as opposed to merely 

10 Even if the Plaintiff had standing at the time of filing, her standing has dissipated. Furthermore, her 
claims are moot. See Troiano v. Supervisor of Elections, 382 F.3d 1276, 1284 (11th Cir. 2004). The 
Eleventh Circuit has found “a challenge to a government policy moot when it has been replaced by a new 
policy that ‘appears to have been the result of substantial deliberation’ on the part of the alleged wrongdoers 
and have been ‘consistently applied’ in the recent past.” Id. Here, the State of Alabama has made it 
unambiguously clear that the challenged conduct cannot reasonably be expected to recur. In the absence 
of any evidence that the policy will be reinstated, this suit may not continue. 
speculative, that the injury will be redressed by a favorable decision.” Lujan, 504 U.S. at 
561 (internal quotations omitted). Here, it is neither likely nor speculative that the injury 

will be redressed; the Plaintiff’s redress has already occurred. This Court cannot issue a 
declaratory judgment finding the Annex null and void; it is already null and void. 
Injunctive relief is similarly impossible, as are any other claims for relief requested by the 
Plaintiff. 
C. The Motion for Preliminary Injunction, Motions to Dismiss, and Motions for 
 Summary Judgment 

 Because the Court lacks jurisdiction over the underlying case, the Court pretermits 
discussion of the Plaintiff’s motion for preliminary injunction and concludes that the 
Plaintiff cannot demonstrate a substantial likelihood of success on the merits. The Court 
likewise determines that discussion or analysis of the pending dispositive motions is not 
necessary or appropriate as the Court lacks jurisdiction in this case. 
 V. CONCLUSION 
 In sum, the Plaintiff does not have standing because she cannot establish an injury 
in fact. The Plaintiff’s alleged risk-as-injury dissipated because the Annex is no longer in 

effect. Furthermore, the Plaintiff cannot establish causation or redressability. 
 Accordingly, it is ORDERED as follows: 
 (1) the Plaintiff’s complaint is dismissed without prejudice for lack of Article III 
 standing, and 
 (2) all pending motions are DENIED as moot.11 
 A separate final judgment will be entered. 

 DONE this 19th day of November, 2020. 
 /s/ Emily C. Marks 
 EMILY C. MARKS 
 CHIEF UNITED STATES DISTRICT JUDGE 

11 When a Plaintiff fails to establish Article III standing, the Court denies all pending motions as moot. See, 
e.g., Lonchar v. Thomas, 58 F.3d 588, 589 (11th Cir. 1995); see also Daniels v. Upton, Ga. Dep’t of Corrs, 
2018 WL 757811, at *1 (11th Cir. Dec. 11, 2018).